**PEOPLE OF PUERTO RICO v. EASTERN SUGAR ASSOCIATES et al.**

**No. 4112.**

Circuit Court of Appeals, First Circuit.

June 28, 1946.

318

David Lloyd Kreeger, Sp. Asst. to the Atty. Gen. (John F. Sonnett, Asst. Atty. Gen., Jerome H. Simonds, Bonnell Phillips, Jane Agnes Parker, Attys., Department of Justice, Warner Gardner, Sol., Irwin W. Silverman, Chief Counsel, Division of Territories and Island Possessions, and Shirley Ecker Boskey, Atty., Department of the Interior, all of Washington, D. C., on the brief), for appellant.

E. T. Fiddler, of San Juan, Puerto Rico, for appellees.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

WOODBURY, Circuit Judge.

This appeal is from an order of the District Court of the United States for Puerto Rico dismissing a petition to condemn approximately 3,100 acres of land situated on the Island of Vieques owned by the appellee, Eastern Sugar Associates, subject to a mortgage held by the appellee, National City Bank of New York, on the ground that the petition fails "to state a public use or purpose for which private property may be acquired by eminent domain."

By Act No. 26 approved April 12, 1941, (Laws of Puerto Rico 1941, p. 388 et seq.) called the "Land Law of Puerto Rico," the insular Legislature launched a far-reaching program of agrarian reform. This law is long and rather complicated. At the moment it will suffice to say that after a lengthy "Statement of Motives" the Act creates a board in the "nature of a governmental agency or instrumentality of The People of Puerto Rico" in the Department of Agriculture and Commerce, to be called the "Land Authority of Puerto Rico", "for the purpose of carrying out the agricultural policy of The People of Puerto Rico as determined by this Act, and to take the necessary action to put an end to the existing corporative latifundia in this Island, block its reappearance in the future, insure to individuals the conservation of their land, assist in the creation of new landowners, facilitate the utilization of land for the best public benefit under efficient and economic production plans; provide the means for the agregados[1] and slum dwellers to acquire parcels of land on which to build their homes, and to take all action leading to the most scientific, economic and efficient enjoyment of land by the people of Puerto Rico." Then the Act goes on to make detailed provisions with respect to the organization, powers, and duties of the Land Authority, and to authorize it both to expropriate lands held in violation of the so called 500 acre provision of the Organic Act (39 Stat. 964, 48 U.S.C.A. § 752) and also to request the Insular Government to acquire on its behalf by eminent domain "title to any real property or estate thereon (sic) which might be necessary or advisable for the purposes of the Authority." The act

---

[1] An agregado, frequently referred to in Puerto Rico as a "squatter", is defined in § 78 of the Act as "any family head residing in the rural zone, whose home is erected on lands belonging to another person or to a private or public entity, and whose only means of livelihood is his labor for a wage."

fully establishes the procedure to be followed in condemnation proceedings and provides, apparently adequately, for payment of "just compensation" for property so taken.

As this Land Law stood, after amendment, at the time the present condemnation proceedings were instituted, the Land Authority was authorized to dispose of lands which it acquired for three purposes; (1) in small parcels to individual agregados for the erection of their dwellings, (2) in somewhat larger parcels to individual farmers for subsistence farms, and (3) in large parcels by lease to expert farmers, agronomists, or other qualified persons with experience in agricultural management, for the operation of "proportional-profit" farms as described in detail in §§ 64–73 of the Act.

Following enactment of the Land Law, the Insular Legislature by Act No. 90, approved May 11, 1944, popularly called the "Vieques Act", made specific provisions for the relief of economic distress which it said existed on the small outlying islands of Vieques and Culebra, both municipalities of Puerto Rico. In its "Statement of Motives" this statute refers to the condemnation of some 20,000 acres of land on Vieques by the United States for Naval purposes (see Baetjer et al. v. United States, 1 Cir., 143 F.2d 391), which it said paralyzed the sugar industry on that island and caused acute economic distress to its inhabitants which could only be relieved by a renewal of that industry there, and the establishment thereon of a distillery, and then it provides:

"Section 1.—The Land Authority is directed and empowered to acquire, through purchase or condemnation proceedings, or in any other form or by any other means compatible with the laws of Puerto Rico, the lands belonging to the Eastern Sugar Associates in the Island of Vieques, as well as any other lands in the Island of Vieques, Puerto Rico, that may be necessary, in the judgment of the Land Authority of Puerto Rico, to carry out the provisions of this Act.

"Section 2.—As soon as the Land Authority acquires these lands from the Eastern Sugar Associates, it shall establish the consequent organization of the same and shall devote them principally to the planting of sugar cane and of any other products that may be necessary to develop in Vieques the sugar industry and the liquor industry."

With this brief outline of the most pertinent statutory provisions, we turn to the proceedings in the case at bar.

In accordance with the provisions of Act No. 26 of 1941, (The Land Law) the Governor of Puerto Rico on March 20, 1945, "representing The People of Puerto Rico, in the name and on order of the Land Authority," filed a petition in the District Court of the Judicial District of Humacao (an Insular Court) for the condemnation of the lands on the Island of Vieques here in litigation. In this petition it is alleged:

"3. The Land Authority desires to condemn the said lands to carry out all of the objects or purposes of the Land Law of Puerto Rico in force, that is to say:

"(a) Distribution and transfer of lands to a number of 'squatters' ('agregados') at the rate of one parcel of not less than one fourth of a cuerda[2] nor more than three cuerdas per family, in which said 'squatters' may erect their dwellings, in harmony with the provisions of Title Fifth of the said Land Law.

"(b) Distribution and operation of lands in individual farms whose area shall fluctuate between five (5) and twenty-five (25) cuerdas, in harmony with the provisions of Title 25 and following of the said Land Law.

"(c) Establishment of farms of proportional benefit whose area shall fluctuate between one hundred (100) and five hundred (500) acres to be dedicated principally to the planting and cultivation of sugar cane in harmony with the provisions of Title Fifth of the said Land Law and Law numbered 90 approved May 11, 1944."

Then the petition goes on to characterize the above purposes as "of public utility" and to aver that the acquisition of the property "is also a public necessity"; that $270,326.33 "is the just and reasonable compensation which the plaintiff should pay for the acquisition of the said properties,

---

[2] A cuerda is .9712 of an acre.

with all their plantations, improvements, uses, servitudes and appurtenances, as well as the buildings" thereon, and that the above sum has been deposited in the office of the Secretary of the Court for the use of the persons entitled thereto.

On the same day that this petition was filed, and also in accordance with the provisions of Act No. 26, supra, the Governor filed in the same court a Declaration of Taking in which it is recited that "the People of Puerto Rico have been requested to condemn" the properties owned by Eastern Sugar Associates on the Island of Vieques here involved; that condemnation is sought "under the authority of, and in conformity with" the Land Law, the Vieques Act, and the Insular Condemnation Act of March 12, 1903, Laws Puerto Rico 1903, p. 50, and that acquisition of the property "is for the purpose of executing the * * * works and projects for the public use and public utility" as set out in Section 3, paragraphs (a), (b) and (c) of the petition which we have quoted above. On the day the petition and declaration were filed, the Humacao District Court entered a judgment vesting title to the lands in fee simple absolute in the Land Authority and giving it the right to immediate possession.

■ Following this action of the insular District Court the appellees on March 24, 1945, petitioned that court for removal of the cause to the District Court of the United States for Puerto Rico—Eastern Sugar Associates on the ground of diversity of citizenship and amount in controversy, 48 U.S.C.A. §§ 863, 864; National City Bank on the ground that it is a national banking association and the suit, so far as it was concerned, arose out of a transaction involving banking in an insular possession of the United States. 48 Stat. 184, 12 U.S.C.A. § 632. Two days later an order was entered removing the cause in accordance with the bank's petition and on March 28, 1945, on motion of the Eastern Sugar Associates, the court below issued an ex parte order temporarily restraining the Land Authority from interfering with the Associates' possession and title. Then on April 3, 1945, after hearing, this temporary injunction was continued until further order of the court.

On April 16, 1945, Eastern Sugar Associates filed a motion to dismiss and an answer, the motion based upon the ground, among others, that it appeared on the face of the complaint that the taking was not for a public use and purpose and thus violated rights guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States and § 2 of the Organic Act of Puerto Rico, 48 U.S.C.A. § 737. On April 21, 1945, the National City Bank of New York answered with a general denial of the material allegations in the complaint and a request that its mortgage lien be transferred to the compensation awarded in the event that judgment should be entered in favor of The People of Puerto Rico. After hearing arguments of counsel on the Associates' motion to dismiss, but taking no evidence, the District Court, on June 22, 1945, entered the order dismissing the petition for condemnation, and vacating and setting aside the judgment of taking and order of possession entered by the insular District Court, from which this appeal is taken.

Federal jurisdiction is clear upon either or both of the grounds advanced in support of the petitions for removal. We may therefore proceed directly to the merits.

■ No question is raised on this appeal as to the constitutional validity of the procedures provided by the insular statutes for the condemnation of land for the use of the Land Authority. Neither is there any question now before us with respect to the adequacy of the amount deposited to pay for the land involved. The basic question presented is whether on the pleadings it can be said that the appellees' land is sought to be taken for a public use. And this requires consideration of the nature as public or private of four possible uses to which the land here involved may, if acquired, be put, to wit, the three specific uses enumerated in the Land Law and in addition the more general use permitted by the Vieques Act. The reason for this is that the Land Law applies to Puerto Rico generally, including the Island of Vieques, and, while the Vieques Act applies only to the latter island, since it is not inconsistent or in conflict with, or repugnant to the Land Law, it does not supplant that law on Vieques,

but instead supplements, enlarges and implements it to cope with the problems said to be peculiar to that island. Thus, since the lands are sought to be condemned "to carry out *all* (italics supplied) of the objects or purposes of the Land Law," and condemnation is sought both under that law and the Vieques Act, the lands may eventually be put, if the appellant prevails, to any one or all of the four uses. Therefore if any one of those uses, each considered, however, as part of a broad, integrated program of agrarian reform as will be pointed out hereafter, is not public, the petition was properly dismissed.

■ Before considering these uses, however, some general comments upon the power of the insular government to acquire property by eminent domain are in order.

Nowhere in the Puerto Rican Organic Act of March 2, 1917 (39 Stat. 951 et seq., 48 U.S.C.A. § 731 et seq.), is this power expressly conferred upon the insular government. The Organic Act does, however, in § 25 vest all local legislative powers in the Puerto Rican Legislature, and in § 37 provide that the "legislative authority herein provided shall extend to all matters of a legislative character not locally inapplicable," and this grant of legislative power with respect to local matters the Supreme Court has said "is as broad and comprehensive as language could make it." Puerto Rico v. Shell Co., 302 U.S. 253, 261, 58 S. Ct. 167, 171, 82 L.Ed. 235, see also Puerto Rico v. Rubert Hermanos, Inc., 309 U.S. 543, 547, 548, 60 S.Ct. 699, 84 L.Ed. 916. In fact these cases stand for the proposition that, as to local matters, the legislative powers conferred upon the Insular Legislature by Congress are "nearly, if not quite, as extensive as those exercised by the state legislatures." Puerto Rico v. Shell Co., supra, 302 U.S. 253, 262, 58 S. Ct. 171, 82 L.Ed. 235. See Roig v. People of Puerto Rico, 1 Cir., 147 F.2d 87, 91. Thus although the Organic Act does not contain a specific delegation of the power of eminent domain, nevertheless we think it

clear that that power, as one characteristically governmental and therefore not dependent upon any specific grant (Hanson Co. v. United States, 261 U.S. 581, 587, 43 S.Ct. 442, 67 L.Ed. 809; Georgia v. Chattanooga, 264 U.S. 480, 44 S.Ct. 369, 68 L.Ed. 796) is by that Act vested in the Puerto Rican Legislature. Furthermore, should any doubt remain, the existence of that power is a necessary inference from the limitation upon its exercise imposed by § 2 of the Organic Act[3] which we shall consider hereafter, and in addition the Insular Legislature at an early date assumed that it had the power by enacting the Puerto Rican Condemnation Act of March 12, 1903, and the Organic Act of 1917 provides (§ 57) that the laws and ordinances of Puerto Rico in force on the date of its enactment shall continue in force until altered, amended or repealed.

■ But the power of the Insular Legislature in this respect is not unlimited. In § 2 of the Organic Act, as already appears, Congress saw fit to allow the Insular Government to take or damage private property only for public use, and then only upon payment of just compensation, and furthermore in the same section it provided that "no law shall be enacted in Porto Rico which shall deprive any person of life, liberty, or property without due process of law." We entertain no doubt that the "situation" of Puerto Rico, that is, its state of social, economic and political development, is such that under the doctrine of the Insular Cases (De Lima v. Bidwell, 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041, and Downes v. Bidwell, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 188) as subsequently developed in Hawaii v. Mankichi, 190 U.S. 197, 23 S.Ct. 737, 47 L.Ed. 1016; Dorr v. United States, 195 U.S. 138, 34 S.Ct. 808, 49 L.Ed. 128, 1 Ann.Cas. 697, and Balzac v. Porto Rico, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627, Congress, in the exercise of its broad power under the Constitution (Art. IV, § 3) to establish an insular government for Puerto Rico, cannot deprive the inhabitants of Puerto Rico of the protection of the last

---

[3] "Private property shall not be taken or damaged for public use except upon payment of just compensation ascertained in the manner provided by law."

two clauses of the Fifth Amendment.[4] But this is an academic question. Whatever Congress might have done, it in fact saw fit to limit the powers of the Insular Government in the matter of taking private property in substantially the language of the Fifth Amendment. Consequently, the Fourteenth Amendment not being directly applicable because Puerto Rico is not a state (Balzac v. Porto Rico, supra) the question before us is to be resolved by reference to the pertinent provisions of either the Organic Act or the Fifth Amendment, it makes no difference which, because for present purposes their language may be regarded as identical.

It does not follow from this, however, that decisions interpreting the Fifth Amendment necessarily apply and those interpreting the Fourteenth Amendment do not. In fact the contrary is true. The reason for this is that the Fifth Amendment limits the powers of the Federal Government and thus decisions under it define "public use" by reference to the limited powers delegated to Congress to legislate within the states, whereas, the Constitutional power of Congress to legislate with respect to territories is comprehensive (Keyes v. United States, 73 App.D.C. 273, 119 F.2d 444, 448), and, as has been pointed out, in the exercise of that comprehensive power, Congress has conferred powers upon the Insular Government which are so all inclusive that they are "nearly, if not quite" as extensive as the general, residual powers of a state. As the Circuit Court of Appeals for the Sixth Circuit said in United States v. Certain Lands in City of Louisville, 6 Cir., 78 F.2d 684, 687, certiorari granted 296 U.S. 567, 56 S.Ct. 154, 80 L.Ed. 400; certiorari dismissed 297 U.S. 726, 56 S.Ct. 594, 80 L.Ed. 1009, "Decisions dealing with condemnation proceedings are to be considered in the light of the powers possessed by the sovereign seeking to exercise the right. What is a public use under one sovereign may not be a public use under another." Thus, although the Fourteenth Amendment does not itself apply, decisions under it dealing with the validity of state laws constitute the best

available authorities in the present situation. Roig v. People of Puerto Rico, 1 Cir., 147 F.2d 87, 91.

To be sure the Fourteenth Amendment does not in terms limit the powers of state governments to takings of private property for "public use" only, as § 2 of the Organic Act limits the power of the Puerto Rican government, but this does not mean that § 2 of the Organic Act imposes an additional or stricter limitation upon the Insular Government than the Fourteenth Amendment imposes upon state governments. The reason for this is that the public use requirement of the Fifth Amendment, which for present purposes is identical with the public use requirement of the Organic Act, has been read into the due process clause of the Fourteenth Amendment. See Fallbrook Irrigation District v. Bradley, 1896, 164 U.S. 112, 17 S.Ct. 56, 41 L.Ed. 369; Clark v. Nash, 1905, 198 U.S. 361, 25 S.Ct. 676, 49 L.Ed. 1085, 4 Ann.Cas. 1171. It is therefore clear that the ultimate test imposed by § 2 of the Organic Act, as well as by the Fourteenth Amendment, is a due process test and thus it is immaterial whether the limiting criteria are stated in terms of "due process of law" or in terms of "public use". In sum, the limitations imposed upon the Insular Government by § 2 of the Puerto Rican Organic Act are substantially the same as the limitations imposed upon the state governments by the Fourteenth Amendment, and therefore, as the powers held by the Insular Government are analogous to the powers held by the governments of the individual states, the Insular Government's power of eminent domain is entitled to the same scope that has been given to the power of eminent domain possessed by the state governments.

This brings us to the concrete question of the nature of the uses to which the Insular Government proposes to put the appellees' lands. But at the threshhold of our consideration of this question, we come face to face with the question upon which the Supreme Court was apparently divided in United States ex rel. Tennessee Val-

---

[4] "No person shall be * * * deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

ley Authority v. Welch et al., 66 S.Ct. 715, that is, the question whether a legislative decision that a taking is for a public use is subject to judicial review. However, we do not feel that we have to attempt to answer this question, because even if it is one within our competence, we think the taking here attempted does not violate "due process."

The four contemplated uses for the land enumerated above are closely inter-related. Each use plays a part in a comprehensive program of social and economic reform. Thus we see no basis for analyzing each proposed use separately. Instead we think the entire legislation should be regarded "as a single integrated effort," United States ex rel. Tennessee Valley Authority v. Welch, 66 S.Ct. 718, to improve conditions on the island, and so viewed we think enactment of the statutes within the power of the Insular Legislature.

We are not, of course, concerned with the wisdom, expediency or even directly with the necessity of the uses for which the land is proposed to be taken. These are legislative questions with which it is clearly established we have nothing whatever to do. "The scope of judicial inquiry in deciding the question of *power* is not to be confused with the scope of legislative considerations in dealing with the matter of *policy*. Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether it is the best means to achieve the desired result, whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance." Chicago, B. & Quincy R. Co. v. McGuire, 219 U.S. 549, 569, 31 S.Ct. 259, 263, 55 L.Ed. 328. See also Rindge Co. v. Los Angeles, 262 U.S. 700, 709, 43 S.Ct. 689, 67 L.Ed. 1186, and cases cited. Our sole concern is with the question whether the Insular Legislature exceeded its power, specifically, whether the proposed taking deprives the appellees of their property without due process of law.

The argument is made that due process is denied because the purpose for taking the appellees' land is only to sell or lease it to others for them to use personally instead of for use by the general public. This argument has been advanced several times in the Supreme Court of the United States in cases of this sort and every time it has been rejected. In Fallbrook Irrigation District v. Bradley, 164 U.S. 112, 162, 17 S.Ct. 56, 64, 41 L.Ed. 369, decided in 1896, the Supreme Court considered the argument fully and in the light of that consideration announced that "It is not necessary, in order that the use should be public, that every resident in the district should have the right to the use of the water." It was considered, and rejected again in Clark v. Nash, 1905, 198 U.S. 361, 367, 25 S.Ct. 676, 49 L.Ed. 1085, 4 Ann.Cas. 1171 et seq., and in Strickley v. Highland Boy Mining Co., 1906, 200 U.S. 527, 531, 26 S.Ct. 301, 50 L.Ed. 581, 4 Ann.Cas. 1174; and in 1916 in Mt. Vernon Cotton Co. v. Alabama Power Co., 240 U.S. 30, 32, 36 S.Ct. 234, 236, 60 L.Ed. 507, Mr. Justice Holmes speaking for a unanimous court said: "The inadequacy of use by the general public as a universal test is established." Then later in 1923 in Rindge Co. v. Los Angeles, supra, page 707 of 262 U.S., 43 S.Ct. 692, 67 L.Ed. 1186, the Supreme Court said: "It is not essential that the entire community, nor even any considerable portion, should directly enjoy or participate in any improvement in order to constitute a public use."

It does not follow from this, however, that a taking of property from one, for the purpose of transferring it to another, without anything more, conforms to due process of law. Some public benefit or advantage must accrue from the transfer and mere financial gain to the taker is not enough, since the Supreme Court has intimated that the power of eminent domain cannot be used by the taking authority in aid of "an outside land speculation." Brown v. United States, 263 U.S. 78, 84, 44 S.Ct. 92, 94, 68 L.Ed. 171. But the local Legislatures nevertheless have wide scope in deciding what takings are for a public use. This is definitely established by the cases arising under the Fourteenth

Amendment already cited and by many more. In the first place a state's power of eminent domain does not necessarily have to be rested upon the ground that the taking is considered necessary for the public health, but may be exercised if the taking "be essential or material for the prosperity of the community." Fallbrook Irrigation District case, 164 U.S. page 163, 17 S.Ct. 65, 41 L.Ed. 369. And in the second place a local Legislature, because of its intimate knowledge of local conditions, has great latitude in determining what uses of land are conducive to community prosperity. The wide scope allowed a state Legislature in this respect is emphasized in Clark v. Nash, supra, and in Cincinnati v. Vester, 281 U.S. 439, 446, 50 S.Ct. 360, 362, 74 L.Ed. 950, decided in 1930, the Supreme Court, citing many cases, said that although the question of what is a public use is a judicial one "In deciding such a question, the Court has appropriate regard to the diversity of local conditions and considers with great respect legislative declarations and in particular the judgments of state courts as to the uses considered to be public in the light of local exigencies." In fact in Old Dominion Co. v. United States, 269 U.S. 55, 66, 46 S.Ct. 39, 40, 70 L.Ed. 162, cited with approval in United States, ex rel. Tennessee Valley Authority, v. Welch, supra, the Supreme Court said that a legislative decision that a given use is public "is entitled to deference until it is shown to involve an impossibility."

 In view of these principles we cannot strike down the legislative program for the Island of Vieques as in violation of the appellees' right to due process of law. That program, in part, may be radical in that if carried out it will put the Insular Government in business in direct competition with the appellee Eastern Sugar Associates. This may be, as the appellees contend, "state socialism." But concrete cases are not to be decided by calling names.

Our function is to pass upon the statutes before us without regard to our views of the wisdom of the political theory underlying them; (McLean v. Arkansas, 211 U.S. 539, 547, 29 S.Ct. 206, 53 L.Ed. 315) it is our duty to determine whether their enactment rested upon an arbitrary belief of the existence of the evils they were intended to remedy, and whether the means chosen are reasonably calculated to cure the evils reasonably believed by the Legislature to exist. Tanner v. Little, 240 U.S. 369, 385, 36 S.Ct. 379, 60 L.Ed. 691. And thus, although we cannot substitute our estimate of the extent of the evils aimed at for that of the Insular Legislature, we are required to make some inquiry into the facts with reference to which the Legislature acted.

 No such inquiry was made by the court below. It ordered the condemnation petition dismissed on motion without taking any evidence because of its erroneous view that there could be no public use for the reason that the property was not intended to be devoted to use by the public generally. But this does not require remand of the case for the purpose of taking evidence and making findings with respect to the facts alleged in the statements of motives included in the statutes under consideration. "Our function is only to determine the reasonableness of the Legislature's belief in the existence of evils and in the effectiveness of the remedy provided. In performing this function we have no occasion to consider whether all the statements of fact which may be the basis of the prevailing belief are well-founded; and we have, of course, no right to weigh conflicting evidence." [5] It seems to us that the reasonableness of the Insular Legislature's belief in the existence of the evils it attempted to cure is amply attested by social and economic conditions in Puerto Rico generally, and on the Island of Vieques in particular, so well known that we, at least as a court having appellate

---

[5] This quotation is from the dissenting opinion of Mr. Justice Brandeis in New State Ice Co. v. Liebmann, 285 U.S. 262, 280, 286, 287, 52 S.Ct. 371, 377, 76 L.Ed. 747, but nevertheless we regard it as authoritative because it was not the point of disagreement in the case and it appears to be but a concise statement of the rule of many earlier cases.

powers over the Supreme Court of Puerto Rico and hence as a sort of insular court, may notice them judicially.

Puerto Rico, including its adjacent islands, is small in area and densely populated, and that congested population is largely dependent upon the land for its livelihood. Puerto Rico v. Rubert Hermanos, Inc., 309 U.S. 543, 548, 60 S.Ct. 699, 84 L.Ed. 916. But it is not directly dependent upon the land because the basic agricultural crop is sugar cane. Indeed it is no secret that sugar dominates the whole insular economy. And the exigencies of sugar cane growing and grinding, which must be done promptly after the cane is cut, are such that rural landholdings have tended to become large and the majority of the workers thereon employable for only a few weeks during the year. Then, in addition to the foregoing, the economy of the Island of Vieques has been disrupted by the withdrawal of a substantial part of its best agricultural land for naval purposes, see Baetjer et al. v. United States, 1 Cir., 143 F.2d 391, thereby rendering it commercially expedient to transport the relatively small amount of cane still grown on that island to Puerto Rico proper for grinding instead of grinding it locally as had been done in the past. Were it necessary we might even go further and point to the plight of Puerto Rico during the late war brought to our attention in Buscaglia v. District Court of San Juan, 1 Cir., 145 F.2d 274. But enough has been said to indicate both that the Puerto Rican Legislature's belief in the existence of a serious economic and social problem was not arbitrary, and that the program to provide not only homesteads and proportional profit farms for agregados and subsistence farms for more skilled farmers, on the Island of Puerto Rico proper, but, in addition to the foregoing, to provide for the renewal of sugar cane grinding and the development of the liquor industry on the Island of Vieques, embodied means reasonably calculated to deal with these problems.

One further point remains to be briefly considered. The appellees contend that the Land Authority which the People of Puerto Rico seek to vest with title to the 3,100 odd acres of land here in question lacks legal capacity to take title because of the five hundred acre provision of the Organic Act,[6] referred to at the outset of this opinion. Their argument in a nutshell is that the Land Authority, although denominated "a governmental agency or instrumentality" in fact has all the essential attributes of a corporation and hence should be regarded as such, and as within the scope of the provision. We do not agree.

Even assuming, although we do not by any means decide, first, that the Land Authority is in fact a corporation, and second, that it is one "authorized to engage in agriculture," it does not seem to us to be the kind of a corporation intended to be included within the scope of the five hundred acre provision. Instead we are of the view from the wording of the provision that it was not intended to apply to governmental corporations created by the Insular Legislature to carry on a public function, but was intended to be limited in its application to private business corporations chartered by the insular government to engage in agriculture for profit, and clearly the Land Authority, whatever it may be, is not such an organization.

The order of the District Court is set aside and the case remanded to that Court for further proceedings not inconsistent with this opinion.

---

[6] 48 U.S.C.A. § 752. "No corporation shall be authorized to conduct the business of buying and selling real estate or be permitted to hold or own real estate except such as may be reasonably necessary to enable it to carry out the purposes for which it was created, and every corporation hereafter authorized to engage in agriculture shall by its charter be restricted to the ownership and control of not to exceed five hundred acres of land; * * *."