**Frank E. MIDKIFF, Richard Lyman, Jr., Hung Wo Ching, Matsuo Takabuki and Myron B. Thompson, Trustees of the Kamehameha Schools/Bishop Estate, Plaintiffs,**

**v.**

**Paul A. TOM, Tony Taniguchi, Wilbert K. Eguchi, Wayne T. Takahashi, Lawrence N. C. Ing, Nobuyoshi Tamura, Andrew I. T. Chang, and David C. Slipher, Commissioners of the Hawaii Housing Authority; Franklin Y. K. Sunn, Executive Director of the Hawaii Housing Authority; and Hawaii Housing Authority, Defendants,**

**and**

**Wai-Kahala Tract "H" Association, Inc.; Halawa Hills Landsale Committee; Awakea Association; Alii Shores Community Association; Enchanted Hills, Unit I; Portlock Community Association (Maunalua Beach); Kokohead Community Lease-Fee, Inc.; West Marina**

**Community Association; Kalama Valley Community Association; Maunalua Triangle-Koko Kai Community Association, Inc.; Hahaione Valley Community Association, Inc.; Kamiloiki Community Association; Lunalilo Marina Community Association; Mariners Ridge and Cove Fee/Lease Conversion Committee; Spinnaker Isle Association; Waialae Iki Community Association; Waiau Community Association; Kahala Community Association, Inc.; Kahala Community Fee Purchase Fund and Halawa Valley Estates Fee Conversion Corporation, Intervenors.**

**Civ. No. 79–0096.**

United States District Court, D. Hawaii.

Dec. 19, 1979.

See also, D.C., 471 F.Supp. 871.

Clinton R. Ashford, Ashford & Wriston, Rosemary T. Fazio, G. Richard Morry, Earl T. Sato, Hamilton, Gibson, Nickelsen, Rush & Moore, Honolulu, Hawaii, for plaintiffs.

R. Brian Tsujimura, Allan G. Kawada, Deputy Attys. Gen., Wayne Minami, Atty. Gen., State of Hawaii, Honolulu, Hawaii, for defendants.

Dennis E. W. O'Connor, James K. Tam, John Francis Perkin, David A. Nakashima, Hoddick, Reinwald, O'Connor & Marrack, Honolulu, Hawaii, for intervenors Wai-Kahala Tract H Ass'n, Inc., et al.

James H. Case, A. Bernard Bays, Carlsmith, Carlsmith, Wichman & Case, Honolulu, Hawaii, for intervenors Kahala Community Ass'n, Inc. and Kahala Community Ass'n Fee Purchase Fund.

Thomas T. Watts, Kemper & Watts, Honolulu, Hawaii, for intervenors Halawa Valley Estates Fee Conversion Corp.

James A. Stubenberg, James H. Lawhn, Stubenberg, Shigemura, Roney & Gniffke, Honolulu, Hawaii, for intervenors Portlock Community Ass'n (Maunalua Beach); Kokohead Community Lease-Fee, Inc.; West Marina Community Ass'n; and Hahaione Valley Community Ass'n, Inc.

## AMENDED MEMORANDUM DECISION

SAMUEL P. KING, Chief Judge.

The Trustees of the Estate of Bernice Pauahi Bishop[1] filed suit in this Court on February 28, 1979, against the Commissioners and Executive Director of the Hawaii Housing Authority and the Hawaii Housing Authority itself, claiming the Hawaii Land Reform Act, now chapter 516 of the Hawaii

---

1. In 1887 Princess Bernice Pauahi Bishop, the last lineal descendant of King Kamehameha the Great, established by Will the Kamehameha Schools/Bishop Estate. The Estate is a perpetual educational trust for the support of two schools, one for boys and one for girls, known as the Kamehameha Schools.

Revised Statutes, was unconstitutional. Chapter 516 allows the State to use the power of eminent domain in order to condemn certain residential land and then sell it to the residential lessees. The Hawaii Housing Authority is given the power and duty to carry out the provisions of chapter 516.

In Hawaii, a few landholders, including the Bishop Estate, own large tracts of residential land. It has been the policy of these landholders to offer long-term leases to individual lessees, rather than to offer residential lots in fee. Although in recent years some of the leased land has been sold to individual lessees, much of the land is still not available for purchase. The Legislature of the State of Hawaii viewed this system of landholding as injurious to the well-being of the people of Hawaii, and adopted chapter 516 in order to allow long-term residential leaseholders the opportunity to buy in fee the land they occupy under a lease.

One of the provisions of chapter 516 provides for a compulsory arbitration procedure that sets the compensation to be paid the fee owners when the land is condemned. A broad temporary restraining order was issued by me on February 28, 1979, and a modified temporary restraining order, enjoining only the implementation of the mandatory arbitration provisions of the statute, was issued on March 27, 1979. A preliminary injunction, declaring those provisions unconstitutional was issued on May 8, 1979. D.C., 471 F.Supp. 871. In my opinion of May 8, 1979, I indicated that the remainder of chapter 516 was probably constitutional. Plaintiffs' constitutional challenge to the remainder of the statute is that the taking of property for the purpose of reselling it to the residential lessees is not for a public purpose, and hence violative of the Fifth Amendment command: "[N]or shall private property be taken for public use, without just compensation."

Plaintiffs have urged this Court to conduct a trial, weigh evidence, and make what is in essence an *a priori* determination of whether the takings authorized by chapter 516 are for a public use. Plaintiffs intend to show that each and every legislative rationale for the statute is wrong.[2] They claim that if all the economic justifications for the statute are disproved, all that is left are social justifications—such as the social engineering goal of land redistribution. These social goals, contend the plaintiffs, cannot alone justify the taking as being for a public use. Plaintiffs concede that the legislative findings as to the economic justifications for the statute should be given deference, but argue that the standard for determining whether the taking is for a public use is *not* whether the legislative findings have a rational basis. They do not point to any particular standard to be used by the Court, except to say that the Court must make a new judicial determination. The plaintiffs indicated at oral argument that they view the question of whether the taking is for a public use as an economic and factual question rather than a legal one.

 This Court disagrees. I must make a judicial determination of whether the taking is for a public purpose, but that determination is limited in scope to the question of whether the plaintiffs were denied substantive due process. The goal, the purpose, the *raison d'être* of the statute must be within the purview of the State's police power, and the means chosen by the Legislature to achieve that goal must not be arbitrary, capricious, or in bad faith. If the Court determines (1) that *any* possible rationale for the statute, expressed or not, is within the bounds of the State's police power, and (2) that the statute is not arbitrary or the product of legislative bad faith, then the statute is constitutional.

The starting point in any legal analysis is *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98,

2. Haw.Rev.Stat. § 516–83 (1976) contains a long list of legislative findings and declarations of purpose and necessity relating to chapter 516.

99 L.Ed. 27 (1954). In that case the Supreme Court held constitutional the District of Columbia Redevelopment Act of 1945. That Act provided for the comprehensive use of the eminent domain power to redevelop slum areas, and also provided for the possible later sale or lease of the condemned lands to private interests. The Court discussed whether the takings authorized by the Act were for a public purpose.

Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation, whether it be Congress legislating concerning the District of Columbia [citation omitted] or the States legislating concerning local affairs. [citations omitted] This principle admits of no exception merely because the power of eminent domain is involved. The role of the judiciary in determining whether that power is being exercised for a public purpose is an extremely narrow one. [citations omitted]

Public safety, public health, morality, peace and quiet, law and order—these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs. Yet they merely illustrate the scope of the power and do not delimit it.

348 U.S. at 32, 75 S.Ct. at 102. The Supreme Court viewed the question of whether the takings were for a public purpose in the same way that it viewed any substantive due process claim. The key question was whether the object of the statute was within the police power authority of the legislature.

Once the object is within the authority of Congress, the right to realize it through the exercise of eminent domain is clear. For the power of eminent domain is merely the means to the end. [citations omitted] Once the object is within the authority of Congress, the means by which it will be attained is also for Congress to determine. Here one of the means chosen is the use of private

enterprise for redevelopment of the area. Appellants argue that this makes the project a taking from one businessman for the benefit of another businessman. But the means of executing the project are for Congress and Congress alone to determine, once the public purpose has been established.

348 U.S. at 33, 75 S.Ct. at 103.

Some courts have taken an extremely narrow view of the judiciary's role in determining whether a taking is for a public purpose. In *United States v. 416.81 Acres of Land*, 514 F.2d 627 (7th Cir. 1975), Mr. Justice Clark was considering a claim that a taking was not for a public purpose because it was in aid of a commercial project.

Though appellant's statement pieces together and rewrites different grounds from different objections, we will accept his version as the strongest presentation of his dual claims that the proposed taking was not for a public purpose and was arbitrary and capricious. Even under these circumstances, however, he has not alleged any sufficient defense. *The only question for judicial review in a condemnation proceeding is whether the purpose for which property was taken is for a Congressionally authorized public use.* [citations omitted] It is not for the courts to review the necessity of the taking. [citations omitted] Nor is it for the courts to consider broadside allegations that the purported public use to be served is merely a pretense or a sham to cover arbitrary official conduct. [citations omitted] Only in cases of egregious bad faith will the right to condemn be denied [citation omitted] for in those circumstances the taking may not be for a "public" use at all.

514 F.2d at 631–32 (emphasis added). Justice Clark's view was that courts could nullify a taking as not being for a public use *only* in the case of bad faith. There is no bad faith alleged in this case, and were this Court to adopt Justice Clark's test, the inquiry into the constitutionality of the statute would end immediately. However, some cases in this Circuit have indicated

that judicial review may extend to the question of whether the taking is arbitrary and capricious.[3]

There are cases similar to Justice Clark's that indicate judicial inquiry ends when it is determined that a taking is for a Congressionally authorized use,[4] other cases that indicate inquiry is limited to determinations of bad faith or arbitrary action,[5] still others that say police power/due process standards are to be used in determining whether a taking is for a public purpose,[6] and even cases that pay lip service to the proposition that a government taking for the purpose of transferring condemned property to private hands is not necessarily for a public purpose.[7]

■ After carefully considering all these cases, the Court has determined that the proper test to be used is that suggested by *Berman*—a police power/due process analysis. It would be irrational to have all government interferences with property rights except eminent domain judged by a substantive due process test, while eminent domain is judged by something else—whether stricter or not. Plaintiffs have cited many cases for the proposition that courts have great latitude in making judicial determinations of what is a public use. These cases, however, were almost all decided before 1930. At that time, to say the least, it took very little to invalidate a statute on substantive due process grounds. On the other hand, I believe those courts that say judicial review is extremely limited

do so because they cannot conceive of legislative actions that are neither arbitrary nor in bad faith, yet still outside the limits of the police power. If the object of chapter 516 (or any one of several objects) is to further the health, safety, morals, or general welfare of the people of Hawaii, and if the means chosen to accomplish that object are rational and not in bad faith, the statute is constitutional.

■ Hawaii, as discussed earlier, has an uncommon system of landholding. A substantial part of all residential land is held by a few interests and leased to a large number of residential lessees. Plaintiffs, Trustees of the Bishop Estate, hold a significant portion of the residential land on Oahu. Section 516–83 of the Hawaii Revised Statutes is entitled "Legislative findings and declaration of necessity; purpose" and in it the Legislature sets forth numerous economic and non-economic rationales for chapter 516. Plaintiffs argue that they can demonstrate that all the economic justifications for the statute are incorrect, and that the Legislature was wrong in enacting the statute. Yet, in order to uphold the constitutionality of chapter 516, this Court believes all it need do is look at the broadest possible rationale for the statute—that of redistributing residential land and changing the pattern of residential ownership in Hawaii. I believe this purpose is within reach of the police power, and hence the takings authorized by the statute are for a public

3. See *Southern Pacific Land Co. v. United States*, 367 F.2d 161 (9th Cir. 1966), *cert. denied*, 386 U.S. 1030, 87 S.Ct. 1478, 18 L.Ed.2d 592 (1967); *United States v. 18.2 Acres of Land*, 442 F.Supp. 800 (E.D.Cal.1977).

4. See, e. g., *United States v. 255.25 Acres of Land*, 553 F.2d 571, 572–73 n. 2 (8th Cir. 1977).

5. *United States v. 58.16 Acres of Land*, 478 F.2d 1055, 1058–59 (7th Cir. 1973); *United States v. Agee*, 322 F.2d 139, 142 (6th Cir. 1963) (language of case somewhat unclear but seems to indicate that judicial determination of public purpose is limited to questions of bad faith or arbitrary action); *Amen v. City of Dearborn*, 363 F.Supp. 1267, 1278 (E.D.Mich. 1973), *rev'd*, 532 F.2d 554 (6th Cir. 1976) ("We note that the court has no power to go beyond

a determination that the legislative body has acted in bad faith or in an arbitrary manner").

6. *People of Puerto Rico v. Eastern Sugar Associates*, 156 F.2d 316 (1st Cir.), *cert. denied*, 329 U.S. 772, 67 S.Ct. 190, 91 L.Ed. 664 (1946); *United States v. 67.59 Acres of Land*, 415 F.Supp. 545, 548–50 (M.D.Pa.1976).

7. *Washington-Summers, Inc. v. City of Charleston*, 430 F.Supp. 1013, 1014–15 (S.D.W.Va. 1977) ("[I]t is equally clear that property cannot be taken by eminent domain for a predominantly private purpose"); *Amen v. City of Dearborn*, 363 F.Supp. 1267, 1279 (E.D.Mich. 1973), *rev'd*, 532 F.2d 554 (6th Cir. 1976) ("[I]ndustrial and commercial use by itself does not constitute a public purpose").

purpose. All that the Court need rely on in the way of evidence to support this conclusion is the system of landholding in Hawaii—the concentration of land in a few large landholders. At the preliminary injunction hearing, there was testimony and documentary evidence concerning the way land is held in Hawaii. The Court believes that given this system of landholding, the Legislature had the right, pursuant to its police power, to conclude that the general welfare of the people of Hawaii was served by condemning the land of large landholder-lessors and allowing the lessees to purchase that land from the State. The Legislature had the right to conclude that Hawaii's system of landholding was injurious to the social and economic health of the community.

■ In *People of Puerto Rico v. Eastern Sugar Associates*, 156 F.2d 316 (1st Cir.), *cert. denied*, 329 U.S. 772, 67 S.Ct. 190, 91 L.Ed. 664 (1946), the Legislature of Puerto Rico enacted the Land Law of Puerto Rico, a far-reaching program of agrarian reform that provided for the condemnation of privately owned land, and for its sale to private parties for residential use and farming. The Vieques Act, also passed by the Legislature of Puerto Rico, provided for the acquisition of land on two outlying islands for the purpose of renewing their sugar industry and establishing a distillery. Pursuant to these Acts, Puerto Rico petitioned the court to condemn 3100 acres of land held by Eastern Sugar Associates. Eastern Sugar challenged the condemnation, claiming the taking was not for a public purpose. The court first concluded that the test for determining public use was a due process test—not some *a priori* judicial determination of public purpose. The court noted that "a taking of property from one, for the purpose of transferring it to another, without anything more, [does not necessarily conform] to due process of law." 156 F.2d at 323. However, all that was needed was "some public benefit or advantage" other than mere financial gain for the state. *Id.* The court then went on to note:

In the first place a state's power of eminent domain does not necessarily have to be rested upon the ground that the taking is considered necessary for the public health, but may be exercised if the taking "be essential or material for the prosperity of the community." [citation omitted] And in the second place a local Legislature, because of its intimate knowledge of local conditions, has great latitude in determining what uses of land are conducive to community prosperity. . . . This [program] may be, as the appellees contend, "state socialism." But concrete cases are not to be decided by calling names. Our function is to pass upon the statutes before us without regard to our views of the wisdom of the political theory underlying them; [citation omitted] it is our duty to determine whether their enactment rested upon an arbitrary belief of the existence of the evils they were intended to remedy, and whether the means chosen are reasonably calculated to cure the evils reasonably believed by the Legislature to exist.

156 F.2d at 324. In this case, the purpose of the statute is in no way to confer immediate monetary gains upon the State as some sort of land speculator. Looking only at one social goal of the legislation—that of redistributing the land—this Court could never say, regardless of how much "evidence" was presented by the plaintiffs, that the Legislature's belief in the social evils to be combated by chapter 516 was arbitrary. Social benefit alone is enough to bring a statute within the purview of the police power. It is true that the Puerto Rico statutes were a broader effort on the part of the Puerto Rico Legislature than was chapter 516 on the part of the Hawaii Legislature. It is true that the Puerto Rico statutes were more comprehensive than chapter 516, and were enacted to combat what were perhaps more serious evils. Yet, it is the Legislature's province to determine just how far to go in trying to solve a problem or series of problems. There are limits to legislative line drawing—those imposed, by, *inter alia*, the equal protection clause—but those are not at issue in this

case. What is at issue is the right of the Legislature to conclude, as it did, that "The State's acquisition of residential lands held in fee simple, through the exercise of the power of eminent domain, for the purposes of this chapter is for the public use and purpose of protecting the public safety, health and welfare of all people in Hawaii." Haw.Rev.Stat. § 516–83(10) (1976).

In *Government of Guam v. Moylan*, 407 F.2d 567 (9th Cir. 1969), the court was considering a Guam redevelopment plan. Prior to World War II, Agana, the capital of Guam, was a patchwork of streets and lots going every which way. Agana was almost completely destroyed in the war, and the government decided to rebuild it. The government wanted, however, to have straight streets and lots. In order to achieve this goal, it condemned land simply to force consolidation of the odd lots. Its purpose was not to hold the land for any particular reason, but rather to sell the new even lots, after condemnation, to private individuals. The Ninth Circuit found that this constituted a public purpose. It is difficult for this Court to see how condemning land to have even streets is more for a public purpose than condemning land so that a large number of long-term lessees can have the opportunity to own the land they live on. Certainly the Hawaii Legislature's determination that the social well-being of the people of Hawaii is served by land redistribution is entitled to as much deference as was given the determination that the social and/or economic well-being of the people of Guam was served by having straight streets.

■ If the goal of the statute—that of land redistribution—is within the ambit of the State's police power, then the only remaining question for the Court is whether the means chosen to achieve that goal are arbitrary. There has been no suggestion by the plaintiffs that if land redistribution is a public purpose the statute is nonetheless arbitrary. There are of course some lines drawn, but line drawing is always necessary in social legislation, and the scope of the Court's review of where those lines are

drawn is very narrow. This Court finds that the Legislature's determinations of what land is subject to condemnation and who is entitled to repurchase from the State are in no way arbitrary or capricious.

■ Even were this Court's view that land redistribution constitutes a permissible public purpose encompassed by the police power incorrect, the Legislature has propounded many economic justifications for the statute. The following are excerpts from Haw.Rev.Stat. § 516–83 (1976).

[S]erious shortage of fee simple residential land . . . .

[A]rtificial inflation of residential land values in the State . . . .

[T]he people of the State have been deprived of a choice to own or take a lease of the land on which their homes are situated . . . .

[The leases] restrict their freedom to fully enjoy [their] land and . . . are weighted heavily in favor of the few landowners of such land . . . .

The economy of the State and the public interest, health, welfare, security, and happiness of the people of the State are adversely affected by such shortage of fee simple residential land and artificial inflation of residential land values . . . .

If the inflationary trend of land continues unchecked, the resultant inflationary total cost of living could create such a large population of persons deprived of decent and healthful standards of life that the consequent disruptions in lawful social behavior could irreparably rend the social fabric which now protectively covers the life and safety of all Hawaii's people. The threat posed by this possibility is sufficiently real and imminent to warrant State action to redistribute land as a means of curbing continuing inflationary rises in land values. . . .

Changing present patterns of land ownership by allowing lessees under long-term leases of residential land to purchase in fee simple, absolute or otherwise, the land on which their homes are

situated, through governmental intervention . . . will help satisfy the pressing public necessity for a secure, strong and stable economy. . . .

The public use and purpose of providing all citizens a decent and healthful standard of life will be directly and substantially furthered by the State's acquisition of residential lands held in fee simple, through the exercise of the power of eminent domain, for the purposes of this chapter.

■ These are just some of the justifications for the act that are set forth in § 516–83. There is no doubt at all that these economic rationales, such as lowering prices and curbing inflation, are clearly encompassed by the police power. This has been the law of the land since the New Deal. The only question for judicial consideration is whether the means chosen by the Legislature to achieve these goals—chapter 516—is arbitrary. In order to prevail, plaintiffs must demonstrate that the statute is arbitrary with respect to every possible economic rationale for the statute—stated and unstated. Plaintiffs have indicated that they could call many witnesses to show that the Legislature was wrong—that chapter 516 will not lower prices, curb inflation, or do anything else to help the people of Hawaii. Yet, it is not this Court's function to determine if the Hawaii Legislature was wrong. It is this Court's job only to determine whether the Hawaii Legislature acted arbitrarily in enacting chapter 516. No matter how much evidence plaintiffs were to present, they could not establish that the Legislature was arbitrary with respect to every economic rationale advanced in support of the statute. The Legislature determined that chapter 516 would bring down prices, and in our system of government that determination is for them and them alone to make. There are limits to judicial deference, but those limits are not even approached in this case. The Legislature simply came up with a plan to improve the quality of life in Hawaii. Whether it was right or wrong is up to the voters, not this Court.

Since the question of whether the takings authorized by chapter 516 are for a public purpose is a legal one, and since this Court has made its determination, there is no point in this case proceeding any further on this issue. Defendants are entitled to summary judgment on the issue of the facial constitutionality of chapter 516, subject to this Court's prior rulings on the statutory provisions relating to mandatory arbitration and just compensation.

Defendants may prepare an appropriate order.