THE COMMONWEALTH OF PUERTO RICO, Plaintiff and Appellee, v. RAMÓN LUIS MÁRQUEZ ET AL., Defendants and Appellants.

No. AP-65-16. Decided March 29, 1966.

*Escudero, Bonilla & Miranda de Escudero* for appellants. *J. B. Fernández Badillo, Solicitor General,* and *Nilita Vientós Gastón, Assistant Solicitor General,* for the Commonwealth.

MR. JUSTICE RIGAU delivered the opinion of the Court.

This is an attack on the constitutionality of § 76 of Title V of the Land Law of Puerto Rico.[1] We must examine the problem posed and the facts of the case in close relation to the society where such problem is produced.

The comprehensive program of economic, political and social reform which is in progress in Puerto Rico since 1941 is of common knowledge.[2]

One of the most far-reaching social programs and of greater benefit for the poor people of the rural communities of this Island is that embodied in Title V of the Land Law of Puerto Rico.[3]

---

[1] Act No. 26 of April 12, 1941, as amended, 28 L.P.R.A. §§ 241–589. Section 76 is found in 28 L.P.R.A. § 553.

[2] Since this footnote is extensive, we have added it as an appendix to this opinion.

[3] See *People of Puerto Rico* v. *Eastern Sugar Associates,* 156 F.2d 316 (1946), *cert. denied,* 329 U.S. 772; Rossenn, *"Puerto Rican Land Reform: The History of an Instructive Experiment,"* 73 Yale L.J. 334 (1963), published also in 33 *Rev. Jur. U.P.R.* 189 (1964); Edel, *"Land Reform in Puerto Rico,"* Caribbean Studies, p. 26 (Oct. 1962); Mathews, *"The Agrarian Reform in Cuba and Puerto Rico,"* 4 *Rev. de Ciencias Sociales U.P.R.* 107, 117 (1960); Steward *et al.,* The People of Puerto

Puerto Rico, with a population of 2,572,000 inhabitants[4] and a population density of approximately 700 persons per square mile,[5] with an approximate area of 2,199,000 acres of which, because of their mountainous condition, only 603,555 acres are capable of cultivation all the time and 91,683 may be cultivated occasionally,[6] has approximately less than one third of cultivable acre per person.

For a brief exposition of the human and social evils which the Legislative Assembly of Puerto Rico intended to cure, see the Declaration of Policy of the aforesaid Land Law (Laws of 1941, p. 390, 28 L.P.R.A. § 241, annotation). There were dozens of thousands of families, comprising several hundreds of thousands of persons, who lived as "agregados" (squatters) on another's land. An "agregado," as defined in the Land Law, is a family head, or a person living alone, residing in the rural zone, whose home is established in a house and lands belonging to another person, or in his own house erected on lands belonging to another person, whose only means of livelihood is his labor for a wage earned from agricultural tasks and who does not possess land as owner. 28 L.P.R.A. § 555.

Through the program of Title V of the Land Law the Social Programs Administration of the Department of Agriculture of Puerto Rico, a public agency which administers the program, cedes gratuitously in perpetual usufruct to the "agregados" a parcel of land having an area of not less than one "cuadro" nor more than three cuerdas.[7]

Rico 71 (1956); Hanson, Transformation 249 (1955); Concepción, *"The Land Authority of Puerto Rico,"* 12 Geo. Wash. L. Rev. 302 (1944).

[4] Planning Board of Puerto Rico, Financial Report to the Governor (1964) (Part One), p. 12.

[5] *Cf.* Puerto Rico Planning Board, Statistical Year Book (1962), p. 5.

[6] Koenig, A Comprehensive Agricultural Program for Puerto Rico 48 (1953).

[7] A "cuadro" is one fourth of one cuerda. A cuerda is equivalent to .9712 of an acre. *People* v. *Eastern Sugar, supra* at 319, n. 2.

The purpose of the program is to provide to the rural families living as "agregados" a parcel of land for establishing their home permanently. They are not thus subject to the uncertainty, anxiety and vexation which they suffered in their condition of "agregados," when they could be ejected from the farms where they lived at the mere caprice of their owners or in reprisal for some disagreement. To these ends the Social Programs Administration acquires, by purchase or condemnation, lands which because of their location and other physical conditions are fit for establishing rural communities. Those lands are subdivided into small parcels and adjudicated by drawing, in perpetual usufruct, to family heads who qualify under the Act.

By June 1965, 67,161 families of "agregados" had been reinstalled in 375 rural communities. The design of these communities provides for the establishment of services and facilities such as schools, health centers, athletic parks, churches, private commercial establishments, and community centers.[8] It is estimated that some 400,000 persons, or approximately one fourth of the rural population of Puerto Rico, live in these communities. There they enjoy the real and psychological security of having a permanent home of their own and services such as water, electric light and schools. It is estimated that there are still some 22,000 peasant families living as "agregados" who wish to establish themselves in the rural communities of this program.[9]

The case being already focused in its historical and sociological reality, let us examine next its specific facts and the law applicable thereto. In 1949 the Social Programs Administration ceded in usufruct a parcel of land of ap-

[8] Social Programs Administration, Department of Agriculture of Puerto Rico, Annual Report 1964–65, p. 9.

[9] Department of Agriculture, *Memorandum to the Legislative Assembly on Agregados Reinstallation Program*, Feb. 25, 1966, mimeographed, pp. 2–7.

proximately 1,000 square meters (one "cuadro") to Tomasa Parrilla, a poor peasant woman of the jurisdiction of the Municipality of Luquillo, Puerto Rico, where she could establish her home.

In 1959 Ramón Luis Márquez, a merchant and resident of Río Piedras, Puerto Rico, "purchased" for $400 from Tomasa Parrilla the perpetual usufruct of the said parcel. The parcel in question is located in Luquillo, on the northeast coast of Puerto Rico, and is adjacent to the beach. Márquez also acquired for that price Tomasa's small house, a one-story paper-roofed frame structure having a frontage of 12 feet and a depth of 14 feet. In an effort to make this transaction legal—we shall see later what the law provides on the matter—this was accomplished by a deed subscribed before an attorney and notary, on which Tomasa, who could not write, impressed her fingerprints.

Subsequently the Commonwealth of Puerto Rico, represented by the Secretary of Agriculture, sued Márquez and the vendor to recover the usufruct of the parcel, with its accessions, in order to redevote it to the aforesaid public purposes pursuant to the provisions of Title V of the Land Law. Plaintiff prevailed at the trial. The purchaser, defendant Ramón Luis Márquez, attacks before us the constitutionality of § 76 of the Land Law, 28 L.P.R.A. § 553. We must therefore refer to that section.

That section begins by providing that in the communities to be established, the Social Programs Administration shall cede gratuitously, in usufruct, to the "agregados" a parcel of land having an area of not less than one cuadro nor more than three cuerdas. It provides that in those farms to be devoted to these purposes which are located in districts where the high cost of the land, the density of the population, or where the topography so justifies, the Social Programs Administration may, upon the approval of the Planning Board and of the Governor, establish parcels of an area of less

than one fourth of a cuerda. Further on, that section provides the following:

"The usufructuary may not, *under penalty of absolute abatement*, sell, transfer, exchange, rent, cede, assign, lease, or in any manner alienate or encumber, in whole or in part, the usufruct right granted him, neither the parcel of land over which the said right is granted him, nor the buildings, accessions, or improvements existing or which he may in the future construct or make thereon, nor any right, title, or privilege arising from the usufruct contract; Provided, That any violation of this clause of the contract shall vest no legal rights whatsoever in any purported acquirer, assignee, or creditor, but shall, on the contrary, without need of judicial pronouncement to that effect, be grounds for seizure, in behalf of the Social Programs Administration, of the usufruct right granted the usufructuary in the parcel, as well as of all interest, right, and action which the purported transferor and/or transferee, creditor and/or debtor, vendor, or acquirer, have or may have in the parcel granted in usufruct, or in the improvements, buildings, accessions, or sown fields existing thereon, the Social Programs Administration being at liberty to dispose of the said parcel, building, structure, sown field, or improvement, without obligation to compensate or pay any person any sum whatsoever for any reason;

"Provided, however, That the Social Programs Administration *may*, in the exercise of its discretion, expressly *authorize* in writing an usufructuary to transfer, cede, exchange, or assign his usufruct right *to another person qualifying* as such usufructuary;

"Provided, further, That any right of usufruct on a parcel, and any house, improvement, plantation, sown field, or building existing thereon which, as a result of the violation of the provisions of this section, reverts or passes to the property of the Social Programs Administration, as aforesaid, shall be awarded by the drawing of lots among the number of *agregados* which the Social Programs Administration may deem pertinent. The provisions of this section shall apply also to the successors in title of the original usufructuaries. In those cases in which the usufructuary of a parcel has ceased to occupy same, in whole or in part, and another person not authorized by the Social Programs Administration is wholly or partially occupying said

parcel, it shall be assumed that there has been an unlawful assignment on the part of the usufructuary of his rights in said parcel, with the consequent results referred to in this Act. . . ." (Italics ours.)

Before us appellant alleges (1) that the statute assailed is unconstitutional as being an undue exercise of the State's police power because, he says, its objective does not come within the ambit of said power, since that Act was enacted in order to favor a special class and not to promote the general welfare. He also alleges (2) that the means provided by the Act are not reasonable and establish a seizure of property without the due process of law.

■ The first contention, which is aimed at the constitutionality of the Land Law, by questioning its public purpose, has already been decided. *People* v. *Eastern Sugar Associates*, 156 F.2d 316 (1946). In that case, as here, the legality of the public purpose of the Land Law of Puerto Rico was questioned. The constitutionality of the Act was sustained by a profound opinion of the Court delivered by Judge Woodbury. The Court said at p. 323 that the contemplated uses for the land under that Act were closely interrelated; that each use played a part in a "comprehensive program of social and economic reform"; that the Act "should be regarded as a single integrated effort to improve conditions on the island, and that it came within the power of the Insular Legislature."

We have no doubt either that, in the light of the realities recited in this opinion, the purposes of the Land Law constitute public objectives coming within the powers of the Legislative Assembly of Puerto Rico. The first contention made by appellant has really become already anachronous. See *Fallbrook Irrigation District* v. *Bradley*, 164 U.S. 112 (1896); *Clark* v. *Nash*, 198 U.S. 361, 367 (1905); *Strickley* v. *Highland Bay Mining Co.*, 200 U.S. 527, 531 (1906); *Mt. Vernon Cotton Co.* v. *Alabama Power Co.*, 240 U.S. 30,

32 (1916); *Rindge Co.* v. *Los Angeles,* 262 U.S. 700, 709 (1923).

We turn next to appellant's second contention. Does Márquez' seizure of his usufruct right over the parcel as well of the improvements existing therein constitute an illegal seizure?

Section 76 provides a series of rules on the manner of implementing the rural communities program and, as we have seen, the usufructuary may not alienate the usufruct right granted him, the parcel, and the improvements existing or which he may in the future construct, *under penalty of absolute abatement, unless* the Social Programs Administration authorizes him to transfer his right to a person qualifying under the law as such usufructuary, and who may therefore avail himself of its benefits. Reiterating expressly his intention, the lawmaker further provided in the same section that "any violation of this clause shall vest no legal rights whatsoever in any purported acquirer."

As to the usufructuary, it is clear that he accepts the usufruct right gratuitously granted him over the parcel for him to occupy and/or cultivate, subject to the express conditions of the Act. Those conditions, which are embodied in § 76, were established, as we shall presently see, for the protection of the social uses contemplated by the program, of its beneficiaries, and of the public funds.

It should be noted that the Act does not contain any absolute prohibition to transfer the usufructuary's rights, but such transfer is subject to the condition that it be made in favor of a person who may qualify to enjoy the benefits of the Act. The limitation is clearly necessary for reasons of public policy. Those lands are acquired with public funds to be ceded gratuituously in usufruct to the "agregados," and the purpose of the program would be completely defeated if the usufruct rights or the parcels could be acquired by

well-to-do persons for whom the program was not clearly designed nor the Act enacted.

■ At this late date it is already well known that the community, through its Government, may establish limitations on the right of ownership for the benefit of the general welfare. *Goldblatt* v. *Town of Hempstead*, 369 U.S. 590 (1962), and cases therein cited; *Texaco, Inc.* v. *Sec. of Public Works*, 85 P.R.R. 686, 694 (1962); *Roselló Hnos.* v. *Figueroa*, 78 P.R.R. 250, 261 (1955).

In matter of restrictions on the power to dispose of property or services, the limitations as to the persons to whom sales may be made are precisely abundant in our legislation. By way of illustration, it is well to point out some of them: No pharmacist may sell at retail certain antibiotics and other drugs to any person except on a medical prescription, 24 L.P.R.A. §§ 933 and 936. Nor may alcoholic beverages or tobacco products be sold to minors under 18 and 16 years, respectively, 33 L.P.R.A. §§ 1021 to 1022a; nor firearms to a person without a license issued to that effect, 25 L.P.R.A. § 438. Similarly, the sugar centrals may not confine themselves to grinding the sugar cane of the farmers of their choice, but the law makes it their duty to grind the cane of specific colonos, 5 L.P.R.A. § 372. Public service companies may not discontinue or reduce the services rendered to a community without a certificate to the effect from the Public Service Commission, 27 L.P.R.A. § 1201 (n). The provisions declaring illegal contracts in violation of the Anti-Trust Act also limit the freedom to alienate or dispose, 10 L.P.R.A. §§ 258, 261 *et seq.*[9a]

■ This type of limitation, like all other limitations on the right of ownership, merely subordinate this right to

---

[9a] See, also, the restrictions imposed by law on the parcels of the Puerto Rico Construction Administration, Act No. 163 of May 8, 1940 (Sess. Laws, p. 956).

the most important social value which the security, health, and general welfare of the community constitute. *Texaco, Inc.* v. *Sec. of Public Works, supra.* In fact, it is no longer seriously questioned at this time that in the exercise of its rule-making power in the public interest the State may adopt measures to protect the health, the morale, and general welfare of the community, without the restrictions which flow from such measures being contrary to the concept of the due process of law. That power of the modern State to protect after the aforementioned social values is also its duty. It is known that at times it is even necessary, in the exercise of the State's police power, to destroy private property without compensation. *Bordas & Co.* v. *Sec. of Agriculture,* 87 P.R.R. 506 (1963).

As stated by Castán, the theory that the right of ownership is unlimited has given way in the face of the modern vision, "according to which the property has individual and social purposes which are sufficient, without need of opposing rights, to impose limitations to them." *La Propiedad y sus Problemas Actuales* 101 (2d rev. ed. 1963, Editorial Reus, Madrid). We copy from the same work: "[A]ccording to the present concept of property, the owner's obligations depend on the most comprehensive concept of the social character of the property." P. 103. See, also, Friedmann, Law in a Changing Society 75–89 (1959) ; III Pound, Jurisprudence 138–40 (1959).

As is known, for legislation of this nature to be declared unconstitutional it is necessary that it be clearly arbitrary and that it bear no reasonable relation to the public purpose contemplated. *Nebbia* v. *New York,* 291 U.S. 502 (1934) ; *A. Roig, Sucrs.* v. *Sugar Board,* 77 P.R.R. 324, 338 (1954).

In order to judge the legislative measure under consideration, it is well to recall the situation for which it was enacted. As stated above, thousands of peasant families lived in a state of almost feudal servitude without having any control

over the piece of land on which their homes were erected. On many occasions the pressures to which these men and women were subjected, as a result of their painful situation of "agregados," violated such fundamental rights as the freedom to have their own political and religious beliefs and to dispose freely of their labor by fair bargaining. In 1948, two members of the House of Representatives of Puerto Rico described the situation as follows:

"Mr. Vega Berríos: . . . in my town, in Yabucoa, the 'agregado' lived in the most terrible tragedy of his life. The time came when attempts were made to abuse the daughters of the 'agregado,' that he could not say anything.

"Mr. Rivera Colón: . . . I, colleague, who come from farming parents, I know how the 'agregados' have been treated; I know how the employer treated them; he not only controlled political matters but also religious matters, and when the employer was a Catholic there could not be a Protestant on the farm. It was a great tragedy; it was a terrible thing. The employee could not vote for the party of his choice." *Minutes of the House of Representatives,* pp. 106–07 (Sixth to Ninth Special Sessions, 1948).

In order to remedy this state of affairs, there was created Title V of the Land Law granting to these "agregados" a portion of land in gratuitous and perpetual usufruct where they may build their houses free from coercion.

Although the original Act prohibited by § 78 thereof the alienation of parcels without the consent of the Land Authority (a public agency originally in charge of this program), such prohibition did not appear in § 76, and some parcels fell into the hands of speculators who took advantage of the economic needs of the "agregados who sold them." In view of such a situation which defeated the objectives of the Act, the Legislative Assembly, by Act No. 44 of June 9, 1948 (Sp. Sess. Laws, p. 126) amended § 76 adding thereto the specific prohibition, under penalty of absolute nullity, to alienate the usufruct, the parcels and the improvements,

except with the authorization of the Social Programs Administration. The use of this mechanism to protect the economically weak against speculators was not novel in Puerto Rico.

Since the enactment of the first Homestead Act in 1915, No. 35 of March 11 of that year (Sess. Laws, p. 65), it was provided that the lands assigned to persons who qualified under the Act, as well as the improvements made thereon, could not be subject to attachment, mortgage, or other encumbrances. It was also provided that the usufructuaries could only sell their rights *with the approval of the Homestead Commission.* Section 17. The Homestead Act of 1921, No. 53 of June 11, 1921 (Sess. Laws, p. 386), adopted similar provisions in §§ 6(b), 6(k), and 16 thereof. Section 16 expressly provided that the beneficiaries could assign the lots and improvements (1) to persons who qualified under the Act, and (2) with the approval of the Homestead Commission. In *Gómez* v. *Collazo,* 67 P.R.R. 453, 456 (1947), we said: "There is no doubt that, under the terms of the Act creating the Homestead Commission, any transfer of the houses, lots, and farms assigned by the Commission must have its approval." Subsequently, in *Romero* v. *Registrar,* 67 P.R.R. 728, 730 (1947), referring to several restrictions contained in the said Homestead Act, among which was that contained in § 16 *supra,* we said:

"All the limitations and conditions which we have enumerated, besides being just and reasonable, are absolutely necessary to prevent the properties assigned to workingmen or persons of limited means from coming into the hands of persons of better means or of speculators."

There is no question that the reasons which the Legislative Assembly had for the aforesaid 1948 explanatory amendment to § 76 were of the same nature as those referred to in the paragraph copied above from *Romero* v. *Registrar, supra.* This is confirmed—if confirmation were necessary

in view of the express wording of § 76—by the debate in the House of Representatives on S.B. 13, which later became the said amendment introduced in § 7 by Act No. 44 of June 9, 1948. Let us see the following extracts from the legislative debate:

"Mr. Ortiz: . . . The purposes of the Act are to benefit the usufructuaries, not the town people,[10] and that is why the provision prohibiting the sale exists. But there is a provision which says that the Land Authority may authorize an usufructuary to sell, provided the sale is made to a person who meets the requisites originally required of the usufructuary wishing to sell . . . the idea is that those who enjoy these houses be usufructuaries, and not that these lands and properties may fall into the hands of the 'smarties' of the town. That is the idea.

"Mr. Rivera Colón: I want to ask the colleague a question. Is there any specific provision in this bill to prevent the recurrence of the situation existing at present in those parcels, most of which are occupied by persons other than 'agregados'?

"Miss Gómez: With these provisions he is fully protected.

"Sr. Rivera Colón: . . . The trouble is that there was something in the Act which was not clear and the parcels were being negotiated and sold, and when it was least expected there came a man from San Juan, who was a businessman, who was going to buy for the purpose of deriving benefit." See *Minutes of the House of Representatives of Puerto Rico,* pp. 103–13 (Sixth to Ninth Special Sessions, 1948).

It is clear that the situation in this case was exactly what the Act seeks to prevent. A businessman from the city of Río Piedras wished to acquire, for the moderate price of $400, a life usufruct over a parcel of 1,000 square meters adjoining the beach on the Luquillo area. We realize that it is desirable to own a beach house in that sector where already in 1936, "in the Luquillo area, lands adjoining the

---

[10] From the context of the debate it may be appreciated that in saying "town people," the lawmaker referred to the people from cities and urban zones in order to distinguish them from the "agregados" who were peasants.

beach, of 1,000 square meters, sell for from five to twelve thousand dollars."[11] It is common knowledge that the beach sector on the northeast coast of Puerto Rico, where the parcel in question is located, has at present a great potential, touristic value. It would be specious and a gross frustration of the public policy embodied in the Act for an agency of the Government of Puerto Rico to purchase or condemn lands for public uses and then allow that the clear and express wording of the Act be violated to carry out what has been attempted in this case.

In other industrialized and more sophisticated societies perhaps the protection of § 76 is not necessary, but in our rural zone, where those rural communities are established and from which the beneficiaries of this program come, such protection is necessary. This case is proof of it.

Not long ago the then Governor of Puerto Rico, Muñoz-Marín, in recommending legislation to enable the families holding lands in perpetual usufruct under Title V of the Land Law to obtain credit to improve their homes, thought it necessary to warn that it be done "without running the risk that the parcel owners may lose their lands to those who covet them for speculative purposes." *Governor's Message to the Legislative Assembly*, February 11, 1964, p. 6.

■ The confiscation referred to, if any, is the sanction provided by the Act in order to accomplish its effective enforcement. In view of all the circumstances considered above, we believe that this sanction is not arbitrary and that it bears direct relation to the public purposes of the Land Law.

---

[11] Negrón-García, *"Impacto del Aumento en el Costo de las Tierras en Puerto Rico: La Administración de Terrenos como Instrumento de Urbanismo,"* 32 *Rev. Jur. U.P.R.* 451, 461 (1963). In another work, it is pointed out that between 1950 and 1958 the value of lands in the Municipality of Cataño increased 5.12 times. In Isla Verde, also a sector of the northeast coast, the increase between 1947 and 1949 was 10.7 times, from $1.95 per meter to $19.83. See Torres-Rigual, *"Control of Land Values Through Taxation,"* 23 *Rev. C. Abo. P.R.* 419, 422 (1963).

It should be noted that the sanction operates only against those who violate the Act. The acquirers who qualify may obtain the approval of the Social Programs Administration for the due acquisition of the usufruct and of the improvements, and in that case there is no confiscation whatsoever. Thus, for example, the Social Programs Administration could not confiscate without compensation the rights of a bona fide usufructuary who has not violated the Act. It could not confiscate either, without compensation, the rights of a bona fide acquirer who has been accepted as such by the Administration. The case at bar clearly is not embraced in those situations.

It is surprising that the aforementioned deed was executed despite such specific wording as that of § 76. It seems to us that it was easy to realize that its purpose was in open violation of the letter and spirit of the Act.

Furthermore, there exist such elementary concepts in our positive law as (1) that acts executed contrary to the provisions of law are void, and (2) that the contracting parties may not make agreements, clauses, and conditions which are in contravention of law, § 4 of the Civil Code, 31 L.P.R.A. § 4; § 1207 of the same Code, 31 L.P.R.A. § 3372. It is also known that he who builds in bad faith on another's land loses what he has built, without having any right to indemnity, § 298 of the Civil Code, 31 L.P.R.A. § 1165. Of Castán we have the following judgment: "He who debases the law, who is ignorant of the solidarity that should deprive in the juridical relations, or who abuses the law . . . does not deserve to seek refuge in the established juridical order."[12]

The judgment appealed from will be affirmed.

Mr. Chief Justice Negrón Fernández did not participate herein. Mr. Justice Hernández Matos concurs in the result.

---

[12] Castán, "La Propiedad y sus Problemas Actuales" 107 (Editorial Reus, Madrid, 1963).

APPENDIX

I. *Books*

—Aitken, Poet in the Fortress: The Story of Luis Muñoz-Marín, 1964.

—Anderson, Party Politics in Puerto Rico, 1965.

—Barela, The Puerto Rico Labor Relations Act: A State Labor Policy and its Application, 1965.

—Benítez, *Sobre el Futuro Cultural y Político de Puerto Rico*, 1965.

—Colorado and Cruz-Monclova, *Noticia y Pulso del Movimiento Político Puertorriqueño*, 1955.

—Fernós, *Puerto Rico Libre y Federado*, 1951.

—Friedrich, Puerto Rico: Middle Road to Freedom, 1959.

—Géigel-Polanco, *El Despertar de un Pueblo*, 1942.

—Goodsell, Administration of a Revolution, 1965.

—Governor's Committee for the Study of the Civil Rights in Puerto Rico, *Report to the Governor of Puerto Rico*, 1959.

—Hanson, Transformation: The Story of Modern Puerto Rico, 1955.

— " Puerto Rico: Land of Wonders, 1960.

—Hill and Back, The Family and Population Control: A Puerto Rican Experiment in Social Change, 1959.

—Koenig, A Comprehensive Agricultural Program for Puerto Rico, 1953.

—Lugo-Silva, The Tugwell Administration in Puerto Rico, 1955.

—Mathews, Puerto Rican Politics and the New Deal, 1960.

—Mills, Senior and Goldsen, The Puerto Rican Journey, 1950.

—Muñoz-Amato, Nélida, *Problemas Administrativos en el Poder Judicial de Puerto Rico*, 1964.

398

—Muñoz-Amato, Pedro, *Introducción a la Administración Pública,* Vol. I (1954), Vol. II (1957), Fondo de Cultura Económica, México.

—Pacheco-Padró, *Puerto Rico, Nación y Estado,* 1955.

—Pagán, *Historia de los Partidos Políticos Puertorriqueños, 1898–1956,* 1959.

—Perloff, Puerto Rico's Economic Future, 1950. There is a Spanish version entitled *El Futuro Económico de Puerto Rico,* condensed by Reck and translated by Colorado, 1951.

—Picó, *Diez Años de Planificación en Puerto Rico,* 1952.

—Picó, *Puerto Rico: Planificación y Acción,* 1962.

—Puerto Rico, Government of, Notes and Comments on the Constitution of the Commonwealth of Puerto Rico, 1952.

—Puerto Rico, Office of the Commonwealth of, Wash., D.C., Documents on the Constitutional History of Puerto Rico, 2d ed., 1964.

—Ramos de Santiago, *El Gobierno de Puerto Rico,* 1965.

—Rigual, *El Poder Legislativo de Puerto Rico,* 1961.

—Sánchez-Vilella, *Función y Acción de la Rama Ejecutiva,* 1965.

—Senior, The Puerto Ricans, 1965.

—Serrano and Rexach, *Un Sistema de Elecciones Primarias para Puerto Rico,* 1955.

—Stead, *Fomento*: The Economic Development of Puerto Rico, A Report of the National Planning Association, 1958.

—Steward *et al.,* The People of Puerto Rico, 1956.

—Tugwell, Puerto Rican Public Papers, 1945.

— " The Stricken Land, 1947.

— " The Art of Politics, 1958.

—Tumin and Feldman, Social Class and Social Change in Puerto Rico, 1961.

—University of Puerto Rico, School of Public Adminis-
tration. Reports to the Constitutional Convention,
The New Constitution of Puerto Rico, 1954.

II. *Official Documents* (cited in chronological order).

—Public Law 600, 81st Congress, July 3, 1950, 64 Stat.
314; L.P.R.A., Vol. 1, 1965 ed., p. 136.

—Constitution of the Commonwealth of Puerto Rico,
L.P.R.A., Vol. 1, 1965 ed., p. 203.

—Resolution No. 23, Final Declarations of the Constitu-
tional Convention of Puerto Rico, L.P.R.A., Vol. 1,
1965 ed., p. 142.

—Public Law 447, 82d Congress, July 3, 1952, 66 Stat.
327; L.P.R.A., Vol. 1, 1965 ed., p. 144.

—Resolution No. 34 of the Constitutional Convention of
Puerto Rico, L.P.R.A., Vol. 1, 1965 ed., p. 145.

—Proclamation: Establishing the Commonwealth of
Puerto Rico, L.P.R.A., Vol. 1, 1965 ed., p. 148.

—Letter of January 17, 1953, from Governor Luis Muñoz-
Marín to President Eisenhower, Department of
State Bulletin (United States), Vol. 28, No. 721,
April 20, 1953, p. 588.

—Memorandum by the Government of the United States
of America Concerning the Cessation of Trans-
mission of Information Under Article 73 (e) of
the Charter with Regard to the Commonwealth
of Puerto Rico, Department of State Bulletin
(U.S.), Vol. 28, No. 721, April 20, 1953, p. 585.

—Letter of March 21, 1953, from United States Repre-
sentative to the United Nations, Henry Cabot
Lodge, to the Secretary General of the United
Nations, Trygvie Lie, Department of State Bul-
letin (U.S.), Vol. 28, No. 721, April 20, 1953,
p. 584.

—United Nations, "Resolution 151 Adopted by the Gen-

eral Assembly of the United Nations in its plenary session No. 459, November 27, 1953."

—Kennedy, "Memorandum from the President to the Heads of Executive Departments and Agencies," 26 Federal Register 6695 (1961). This document is also printed in Documents on the Constitutional History of Puerto Rico, 2d ed., 1964, p. 206.

—Senate of the United States, Report of the Committee on the Judiciary of the Senate to accompany H.R. 7038, of August 14, 1961, 87th Congress, 1st Session, Report No. 735.

—Public Law 87–189, 87th Congress (H.R. 7038), August 30, 1961, 75 Stat. 417.

—Resolution No. 1 of the Legislative Assembly of Puerto Rico, December 3, 1962, L.P.R.A., Vol. 1, 1965 ed., p. 151.

—Public Law 88–271, February 20, 1964, L.P.R.A., Vol. 1, 1965 ed., p. 154.

III. *Articles, Addresses and Pamphlets.*

—Amadeo-Murga, "Distribution of Power Between Federal and Local Courts and the Rise of Federalism in the Commonwealth of Puerto Rico," 20 *Rev. C. Abo. P.R.* 29 (1959).

—Barton, *Puerto Rico's Industrial Development Program,* Harvard University, Center of International Affairs, October 29, 1959.

—Cancio, *"The Power of the Congress to Enter into a Compact with the People of Puerto Rico: The Legal Status of the Compact,"* 22 *Rev. C. Abo. P.R.* 341 (1962).

—Clapp, *"Management Improvement in Puerto Rico,"* 12 Public Administration Rev. 30 (1952).

—Clark and Rogers, *"The New Judiciary Act of Puerto*

Rico: A Definite Court Reorganization," 61 Yale L.J. 1147 (1952).

—Davis, *Puerto Rico: A Crowded Island*, 285 The Annals of the American Academy of Political and Social Science 116 (1953).

—Edel, *"Land Reform in Puerto Rico, 1940–1959,"* Caribbean Studies 26–60 (1962).

—Elliot, Shelden, *"Our Faith in Justice: Puerto Rico Shows the Ways to Better Courts,"* 42 A.B.A.J. 24 (1956).

—Emerson, *"Puerto Rico and American Policy Toward Dependent Areas,"* 285 The Annals of the American Academy of Political and Social Science 9 (1953).

—Fernós-Isern, *"From Colony to Commonwealth,"* 285 The Annals of the American Academy of Political and Social Science 16 (1953).

—Friedrich, *"The World Significance of the New Constitution,"* op. cit. supra, p. 42.

—Galbraith and Solo, *"Puerto Rican Lessons in Economic Development,"* op. cit. supra, p. 55.

—García-Passalacqua, *"The Judicial Process and the Status of Puerto Rico,"* 30 *Rev. Jur. U.P.R.* 145 (1961).

—García-Passalacqua, *"La Legalidad de la Estadidad Asociada de Puerto Rico,"* 23 *Rev. C. Abo. P.R.* 173 (1963). This work is a revised version of another entitled "The Legality of the Associated Statehood of Puerto Rico," 4 Inter-American Law Review 287 (1962), published also in Spanish in that review.

—Gutiérrez-Franqui and Wells, "The Commonwealth Constitution," 285 The Annals of the American Academy of Political and Social Science 33 (1953).

—Hayn, *"Puerto Rico's Economic Growth,"* 12 Inter-American Economic Affairs 51 (1958).

—Helfeld, *"Congressional Intent and Attitude Toward Public Law 600 and the Constitution of the Commonwealth of Puerto Rico,"* 21 *Rev. Jur. U.P.R.* 255 (1952). Compare, of the same author, his "Statement Before the Sub-Committee of Insular Affairs of the House and Senate," United States Congress, mimeographed.

—Hernández-Colón, *"The Commonwealth of Puerto Rico: Territory or State?,"* 19 *Rev. C. Abo. P.R.* 207 (1959).

—Howell, *"The Planning System of Puerto Rico,"* 23 The Town Planning Review 211, University of Liverpool (1952).

—Irizarry, *"Veinte Años de Evolución Presupuestaria en Puerto Rico,"* *Boletín de Gerencia Administrativa,* Aug.–Sept. 1962, pp. 5–18.

—Life magazine, editorial, *"Thank Heaven for Puerto Rico,"* March 15, 1954.

—Magruder, *"The Commonwealth Status of Puerto Rico,"* 15 U. Pitt. L. Rev. 1 (1953).

—Morales-Carrión, *Ojeada al Proceso Histórico de Puerto Rico* (1950). Department of Education of Puerto Rico Editorial, 33 pages.

—Morales-Yordán, *"The Constitutional and International Status of the Commonwealth of Puerto Rico,"* 18 *Rev. C. Abo. P.R.* 5 (1957).

—Muñoz-Amato, *"Congressional Conservatism and Puerto Rican Democracy in the Commonwealth Relationship,"* 21 *Rev. Jur. U.P.R.* 321 (1952). Also in 285 The Annals of the American Academy of Political and Social Science 23 (1953).

—Muñoz-Marín, *"Puerto Rico in the Area of Democracy,"* 12 The University of Puerto Rico Bulletin 3 (1941).

— " " *"Development Through Democracy,"* 285 The Annals of the American Academy of Political and Social Science 1 (1953).

— " " *"Puerto Rico and U.S., Their Future Together,"* 32 Foreign Affairs 541 (1954).

— " " *Annual Messages of the Governor to the Legislative Assembly of Puerto Rico* (1949–1964). Each message is printed separately in English and Spanish.

— " " "An America to Serve the World" (1956). Department Education Editorial.

—Negrón-García, *"Impacto del Aumento en el Costo de las Tierras en Puerto Rico: La Administración de Terrenos como Instrumento del Urbanismo,"* 32 *Rev. Jur. U.P.R.* 451 (1963).

—Picó, *"The Role of Planning in Puerto Rico,"* 285 The Annals of the American Academy of Political and Social Science 70 (1953).

—Sánchez-Vilella, *"The Challenge of Change,"* Address, Ohio State University, March 18, 1966. Complete text in The San Juan Star of March 19, 1966, pp. 18 and 42.

—Serrano-Geyls, "Executive-Legislative Relationships in the Government of Puerto Rico," mimeographed (1954).

—Steward, *"Culture Patterns of Puerto Rico,"* 285 The Annals of the American Academy of Political and Social Science 95 (1953).

—Torres-Rigual, *"Control of Land Value Through Taxation,"* 23 *Rev. C. Abo. P.R.* 419 (1963).

—Trías, *"Funcionamiento de los Tribunales Bajo la Constitución de Puerto Rico, 1952–1958,"* 28 *Rev. Jur. U.P.R.* 21 (1958).

— " *"Derecho y Justicia en Puerto Rico,"* 25 *Rev. C. Abo. P.R.* 417 (1965).

—United States, State Department, *"Puerto Rico's New Self-governing Status,"* 28 Department of State Bulletin, No. 721, April 20, 1953, p. 584, Washington, D.C.

—Warren, "Address on the Dedication of the New Supreme Court of P.R.," mimeographed (1956).

—Watson, *"The Contribution of Personnel Management to Puerto Rican Progress,"* 79 Good Government 43 (1962).

—Wells, *"Administrative Reorganization in Puerto Rico,"* 9 Western Political Quarterly 470 (1956).

— " "Constitutional Development in Puerto Rico," *Developments Towards Self-Government in the Caribbean,* a symposium, The Netherlands Universities Foundation for International Cooperation, The Hague, p. 73 (1955).

— " "The Nature of Puerto Rican Government and Politics," *ibid.,* p. 134.

— " "Future Possibilities for Puerto Rican Constitutional Development," *ibid.,* p. 201.

— " "Ideology and Leadership in Puerto Rican Politics," 49 Am. Pol. Sci. Rev. 22 (1955).