EL ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandante y apelado, *v.* RAMÓN LUIS MÁRQUEZ y TOMASA PARRILLA, demandados y apelantes.

*Número:* AP-65-16     *Resuelto:* 29 de marzo de 1966

*Escudero, Bonilla & Miranda de Escudero*, abogados de los apelantes; *J. B. Fernández Badillo, Procurador General* y *Nilita Vientós Gastón, Procuradora General Auxiliar,* abogados del Estado Libre Asociado.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

Se impugna la constitucionalidad del Art. 76 del Título V de la Ley de Tierras de Puerto Rico. ([1]) Debemos examinar el problema planteado y los hechos del caso en estrecha relación con la sociedad en que dicho problema se produce.

Es de conocimiento general el amplio programa de reforma económica, política y social que está en marcha en Puerto Rico desde el año 1941. ([2])

Uno de los programas de mayor alcance social y de mayor provecho para la gente pobre de la ruralía de esta isla es el

---

([1]) Ley Núm. 26 de 12 de abril de 1941, según enmendada, 28 L.P.R.A. secs. 241–589. El Art. 76 se encuentra en 28 L.P.R.A. sec. 553.

([2]) Como este escolio es extenso lo hemos colocado como apéndice a esta opinión.

comprendido en el Título V de la Ley de Tierras de Puerto Rico. [3]

Puerto Rico con una población de 2,572,000 habitantes [4] y una densidad problacional de aproximadamente 700 personas por milla cuadrada, [5] con aproximadamente un área de 2,199,000 acres, de los cuales por su condición montañosa, solamente 603,555 acres son cultivables todo el tiempo y 91,683 son cultivables ocasionalmente, [6] tiene aproximadamente menos de 1/3 de acre cultivable por persona.

Para una breve exposición de los males humanos y sociales que la Asamblea Legislativa de Puerto Rico quiso corregir véase la Exposición de Motivos de la citada Ley de Tierras, Leyes (1941), pág. 391, 28 L.P.R.A. sec. 241, anotación. Había docenas de miles de familias, que comprendían varios cientos de miles de personas, que vivían como "agregados" en terreno ajeno. Un "agregado," según lo define la propia Ley de Tierras, es un jefe de familia, o una persona que viva sola, que resida en la zona rural, cuyo hogar se encuentre en casa y terreno ajenos o que viva en casa propia edificada en terreno ajeno, cuyo único medio de vida sea el trabajo a jornal devengado en labores agrícolas, y que no posea terreno en calidad de dueño. 28 L.P.R.A. sec. 555.

---

[3] Véanse People of Puerto Rico v. Eastern Sugar Associates, 156 F.2d 316 (1946), cert. den. 329 U.S. 772; Rosenn, "Puerto Rican Land Reform: The History of an Instructive Experiment," 73 Yale L.J. 334 (1963); publicado también en 33 Rev. Jur. U.P.R. 189 (1964); Edel, "Land Reform in Puerto Rico," Caribbean Studies, pág. 26 (Oct. 1962); Mathews, "The Agrarian Reform in Cuba and Puerto Rico," 4 Rev. de Ciencias Sociales U.P.R. 107, 117 (1960); Steward et al., The People of Puerto Rico (1956) pág. 71; Hanson, Transformation (1955) pág. 249; Concepción, "The Land Authority of Puerto Rico," 12 Geo. Wash. L. Rev. 302 (1944).

[4] Junta de Planificación de P.R., Informe Económico al Gobernador (1964) (Primera Parte), pág. 12.

[5] Cf. Junta de Planificación de P.R., Anuario Estadístico (1962), pág. 5.

[6] Koenig, A Comprehensive Agricultural Program for Puerto Rico (1953), pág. 48.

✓ Mediante el programa del Título V de la Ley de Tierras, la Administración de Programas Sociales del Departamento de Agricultura de Puerto Rico, organismo público que administra dicho programa, cede gratuitamente en usufructo perpetuo a los agregados una parcela de terreno de un área no menor de un "cuadro" ni mayor de tres cuerdas. ([7])

El propósito de dicho programa es proveerle a las familias campesinas que viven como "agregados," un predio de terreno donde ubicar su hogar permanentemente. Así no están presas de la incertidumbre, zozobra y vejámenes que sufrían en su condición de agregados, cuando podían ser echadas de las fincas en donde vivían por el mero capricho de los dueños de las mismas o como represalia por alguna desavenencia. Para estos fines la Administración de Programas Sociales adquiere, mediante compra o expropiación, terrenos que por su ubicación y otras condiciones físicas se presten para el establecimiento de comunidades rurales. Esos terrenos se subdividen en pequeñas parcelas y se adjudican mediante sorteo en usufructo perpetuo a los jefes de familia que cualifican según la ley.

Hasta junio de 1965 se habían reinstalado 67,161 familias de agregados en 375 comunidades rurales. El diseño de estas comunidades provee para el establecimiento de servicios y facilidades tales como escuelas, centros de salud, parques atléticos, iglesias, establecimientos privados comerciales y centros comunales. ([8]) Se estima que en estas comunidades residen alrededor de 400,000 personas, o sea, aproximadamente una cuarta parte de la población rural de Puerto Rico. Disfrutan allí de la seguridad real y sicológica de tener un hogar propio y permanente, y de servicios tales como agua, luz eléctrica y escuelas. Se calcula que todavía hay unas 22,000

---

([7]) Un "cuadro" es una cuarta parte de una cuerda. Una cuerda equivale a .9712 de un acre. *People of Puerto Rico* v. *Eastern Sugar Associates*, supra, 319 n. 2.

([8]) Administración de Programas Sociales, Departamento de Agricultura de P.R., *Informe Anual 1964-65*, pág. 9.

familias campesinas viviendo en agrego y que desean ins-
talarse en las comunidades rurales de este programa.(⁹)

Situado ya el caso en su realidad histórica y sociológica
veamos ahora sus hechos específicos y la ley aplicable al
mismo. En el año 1949 la Administración de Programas
Sociales cedió en usufructo una parcela de terreno de apro-
ximadamente mil metros cuadrados (un "cuadro") a Tomasa
Parrilla, campesina pobre, de la jurisdicción del municipio de
Luquillo, P.R., para que ésta pudiese fijar allí su hogar.

En 1959 Ramón Luis Márquez, comerciante y vecino de
Río Piedras, P.R., le "compró" por $400.00 a Tomasa Parrilla
el usufructo perpetuo de dicha parcela. La parcela en cuestión
está sita en Luquillo, en la costa noreste de Puerto Rico, y
colinda con la playa. Por dicho precio también adquirió
Márquez la casita de Doña Tomasa, estructura de una planta,
de 12 pies de frente por 14 de fondo, construida de madera y
techada de cartón. En un esfuerzo por darle visos de legalidad
a esta transacción—más adelante veremos lo que dispone la
ley sobre el particular—se hizo la misma mediante escritura
firmada ante un abogado-notario, estampando en ella sus
huellas digitales Doña Tomasa, por no saber escribir.

Posteriormente el Estado Libre Asociado de Puerto Rico,
representado por el Secretario de Agricultura, demandó a
Márquez y a la vendedora para recobrar el usufructo de la
parcela, con sus accesiones, para dedicarla otra vez a los
fines públicos anteriormente dichos, bajo las disposiciones del
Título V de la Ley de Tierras. Venció en juicio el deman-
dante. Impugna ante nos el comprador demandado Ramón
Luis Márquez la constitucionalidad del Art. 76 de la Ley de
Tierras antes citado, 28 L.P.R.A. sec. 553. Corresponde, pues,
que nos remitamos a dicho artículo.

---

(⁹) Departamento de Agricultura, *Memorando a la Asamblea Legis-
lativa Sobre Programa de Reinstalación de Agregados*, 25 Feb. 1966,
mimeo. págs. 2–7.

Comienza el mismo disponiendo que en las comunidades a establecerse, la Administración de Programas Sociales cederá en usufructo gratuitamente a los agregados una parcela de terreno de un área no menor de 1 cuadro ni mayor de 3 cuerdas. Expresa que en aquellos terrenos a dedicarse a estos fines que estén radicados en zonas donde el alto costo del terreno, la densidad de la población, o la topografía lo justifiquen, la Administración de Programas Sociales podrá, previa la aprobación de la Junta de Planificación y del Gobernador, establecer parcelas de un área menor de un cuarto de cuerda. Más adelante dispone dicho artículo lo siguiente:

"El usufructuario no podrá, *bajo pena de nulidad absoluta*, vender, transferir, permutar, alquilar, ceder, asignar, arrendar ni en modo alguno enajenar o gravar en todo o en parte, el derecho de usufructo que se le conceda, ni la parcela de terreno sobre la cual se le conceda dicho derecho, ni las edificaciones, accesiones o mejoras existentes, o que en el futuro levante o introduzca en la misma, ni ningún derecho, título o privilegio derivado del contrato de usufructo; Disponiéndose, que cualquier violación de esta disposición no conferirá derechos legales de clase alguna a ningún supuesto adquirente, cesionario o acreedor, sino que, por el contrario, producirá, sin que medie declaración judicial al efecto, la confiscación a favor de la Administración de Programas Sociales del derecho de usufructo concedido al usufructuario sobre la parcela, así como de todo interés, derecho y acción que sobre la parcela cedida en usufructo, o sobre las mejoras, edificaciones, accesiones o siembras existentes en la misma tuviera o pudiera tener el supuesto cedente y/o cesionario, acreedor y/o deudor, vendedor o adquiriente, quedando la Administración de Programas Sociales en libertad de disponer en dicha parcela, construcción, edificación, siembra o mejoras, sin tener que indemnizar o pagar cantidad de dinero a persona alguna por ningún concepto;

"Disponiéndose, sin embargo, que la Administración de Programas Sociales en el ejercicio de su discreción, *podrá autorizar* expresamente y por escrito a un usufructuario a transferir, ceder, permutar o asignar su derecho de usufructo *a otra persona que cualifique* como tal usufructuario;

"Disponiéndose, además, que cualquier derecho de usufructo sobre una parcela, así como cualquier casa, mejora, plantación, siembra o edificación enclavada en la misma, que como consecuencia de una violación a las disposiciones de esta sección revierta o pase a ser propiedad de la Administración de Programas Sociales como antes se ha dicho, será sorteado entre el número de 'agregados' que la Administración de Programas Sociales estime pertinente. Las disposiciones de esta sección serán también aplicables a los sucesores en título de los usufructuarios originales. En aquellos casos en que el usufructuario de la parcela haya dejado de ocuparla total o parcialmente, y que otra persona no autorizada por la Administración de Programas Sociales esté ocupando total o parcialmente dicha parcela, se presumirá que ha habido una cesión ilegal por parte del usufructuario de sus derechos sobre dicha parcela, con las correspondientes consecuencias a que se hace referencia en esta Ley. . . ." (Subrayado nuestro.)

Ante nos alega el apelante (1) que el estatuto impugnado es inconstitucional por ser un ejercicio indebido del poder público del estado (*"police power"*) porque, expresa, su objetivo no cae dentro del ámbito de dicho poder ya que dicha ley se promulgó para favorecer a una clase especial y no para fomentar el bienestar general. También alega (2) que los medios que la ley fija no son razonables y establecen una confiscación de propiedad sin el debido procedimiento de ley.

El primer argumento, el cual va dirigido a la constitucionalidad de la Ley de Tierras, al cuestionar su fin público, ya ha sido resuelto. *People of Puerto Rico* v. *Eastern Sugar Associates*, 156 F.2d 316 (1946). Allí, como aquí, se cuestionó la legalidad del propósito público de la Ley de Tierras de Puerto Rico. La constitucionalidad de la ley fue sostenida mediante una penetrante opinión del Tribunal emitida por voz del Juez Woodbury. A la pág. 323 el Tribunal expresó que los fines a que se destinarían las tierras bajo dicha ley estaban íntimamente relacionados entre sí; que cada uno de dichos fines formaba parte de un "amplio programa de reforma social y económica;" que la ley "comprendía un propósito

integrado para mejorar las condiciones en la isla y que la misma caía dentro de las facultades de la Asamblea Legislativa de Puerto Rico."

No tenemos duda nosotros tampoco de que a la luz de las realidades reseñadas en esta opinión, los fines de la Ley de Tierras constituyan objetivos públicos que caen dentro de las facultades de la Asamblea Legislativa de Puerto Rico. Ese primer argumento utilizado por el apelante realmente resulta ya anacrónico. Véanse *Fallbrook Irrigation District* v. *Bradley*, 164 U.S. 112 (1896) ; *Clark* v. *Nash*, 198 U.S. 361, 367 (1905) ; *Strickley* v. *Highland Bay Mining Co.*, 200 U.S. 527, 531 (1906) ; *Mt. Vernon Cotton Co.* v. *Alabama Power Co.*, 240 U.S. 30, 32 (1916) ; *Rindge Co.* v. *Los Angeles*, 262 U.S. 700, 709 (1923).

Nos dirigimos ahora al segundo planteamiento del apelante. ¿Constituye la confiscación hecha a Márquez del derecho de usufructo sobre la parcela así como de las mejoras allí existentes, una confiscación ilegal?

El Art. 76 dispone una serie de normas sobre la forma de instrumentar el programa de comunidades rurales y, como hemos visto, prohibe al parcelero enajenar el derecho de usufructo que se le concede, la parcela, y las mejoras que allí existan o que lleve a cabo, *so pena de nulidad absoluta, salvo que* la Administración de Programas Sociales le autorice a transferir su derecho a una persona que cualifique bajo la ley como usufructuario y que por lo tanto pueda acogerse a los beneficios de la misma. Reiterando expresamente su intención el legislador dispuso más adelante en el mismo artículo que "cualquier violación de esta disposición no conferirá derechos legales de clase alguna a ningún supuesto adquirente . . . ."

En cuanto al usufructuario se trata es claro que éste acepta el derecho de usufructo que gratuitamente se le concede sobre la parcela para vivirla y/o cultivarla, sujeto a las condiciones expresas de la ley. Esas condiciones contenidas en

el citado Art. 76 fueron establecidas, como veremos más adelante, para la protección de los fines sociales que el programa persigue, de sus beneficiarios y de los fondos públicos.

Nótese que la ley no contiene una prohibición absoluta de transferir los derechos del usufructuario, sino que condiciona esa transferencia a que la misma se haga a favor de una persona que cualifique para acogerse a los beneficios de la ley. La limitación es una claramente necesaria por razones de orden público. Estos terrenos se adquieren con fondos públicos para ser cedidos gratuitamente en usufructo a los agregados y se desvirtuaría completamente el propósito del programa si los derechos de usufructo o las parcelas pudieran ser adquiridas por personas pudientes para los cuales claramente no se ideó ese programa ni estatuyó esa ley.

A estas alturas ya es bien conocido que la comunidad, a través de su Gobierno, puede establecer limitaciones al derecho de propiedad en beneficio del bienestar general. *Goldblatt* v. *Town of Hempstead*, 369 U.S. 590 (1962) y autoridades allí citadas; *Texaco Inc.* v. *Srio. de Obras Públicas*, 85 D.P.R. 712, 722 (1962); *Roselló Hermanos* v. *Figueroa*, 78 D.P.R. 261, 273 (1955).

Precisamente en materia de restricciones a la facultad de disponer de bienes o servicios, las limitaciones en cuanto a las personas a quienes se puede vender son abundantes en nuestra legislación. Por vía de ilustración cabe señalar algunas de ellas: Ningún farmacéutico puede vender al detal ciertos antibióticos y otras drogas a ninguna persona que no le entregue una receta médica, 24 L.P.R.A. secs. 933 y 936. Tampoco se permite vender bebidas alcohólicas ni productos de tabaco a menores de 18 y 16 años respectivamente, 33 L.P.R.A. secs. 1021 a 1022a; ni armas de fuego a una persona que no posea una licencia expedida al efecto, 25 L.P.R.A. sec. 438. De igual forma las centrales azucareras no pueden limitarse a moler las cañas de los agricultores que ellas escojan, sino que la ley les impone el deber de moler las cañas de

determinados colonos, 5 L.P.R.A. sec. 372. Las empresas de servicio público no pueden descontinuar o reducir los servicios que prestan a una comunidad sin un certificado al efecto de la Comisión de Servicio Público, 27 L.P.R.A. sec. 1201(n). Igualmente restringen la libertad de enajenar o disponer las disposiciones que declara ilegal los contratos en violación de la Ley de Monopolios, 10 L.P.R.A. secs. 258, 261 y ss.[9a]

■ Este género de restricciones, al igual que todas las otras limitaciones al derecho de propiedad, no hacen otra cosa que sujetar este derecho al más importante valor social que constituye la seguridad, salud y bienestar general de la comunidad. *Texaco Inc.* v. *Srio. de Obras Públicas,* supra. En efecto, hoy ya no se cuestiona seriamente que en el ejercicio de su poder de reglamentación en el interés público el Estado puede adoptar medidas para proteger la salud, la moral y el bienestar general de la comunidad, sin que las restricciones que surjan de tales medidas sean contrarias al concepto del debido procedimiento de ley. Este poder del Estado moderno de velar por los antes mencionados valores sociales es también su deber. Es sabido, que en ocasiones es necesario que en el ejercicio del poder público del Estado se llegue hasta a destruir propiedad privada sin compensación. *Bordas & Co.* v. *Srio. de Agricultura,* 87 D.P.R. 534 (1963).

Como señala Castán, la teoría de que el derecho de propiedad es un derecho ilimitado ha cedido ante la visión moderna, "según la cual la propiedad tiene fines individuales y sociales, los cuales bastan, sin necesidad de derechos contrapuestos, para imponerle limitaciones."—*La Propiedad y sus Problemas Actuales,* 2da. ed. revisada, Editorial Reus, Madrid (1963), pág. 101. De la misma obra copiamos: "[S]egún el concepto actual de propiedad, las obligaciones del propietario dependen del más amplio concepto del carácter social de la propiedad." Pág. 103. V. también Friedmann, *Law in a Changing Society*

---

[9a] V. también las restricciones impuestas por ley a las parcelas de la P.R.R.A. Ley Núm. 163 de 8 de mayo de 1940, Leyes, pág. 957.

(1959), págs. 75–89; Pound, *Jurisprudence*, Vol. III (1959), págs. 138–140.

Como se sabe, para que legislación de esta naturaleza sea declarada inconstitucional es necesario que la misma sea claramente arbitraria y que no guarde una relación razonable con el propósito público que persigue. *Nebbia* v. *New York*, 291 U.S. 502 (1934); *A. Roig Sucrs.* v. *Junta Azucarera*, 77 D.P.R. 342, 357 (1954).

Para juzgar la medida legislativa en cuestión conviene recordar la situación para la cual la misma fue aprobada. Como dijimos antes, miles de familias campesinas vivían en un estado de servidumbre casi feudal sin tener ningún control sobre el pedazo de tierra en que descansaban sus hogares. En muchas ocasiones las presiones a que se veían sometidos estos hombres y mujeres, como consecuencia de su penosa situación de "agregados," violaban derechos humanos tan fundamentales como la libertad de sostener sus propias creencias políticas y religiosas y de disponer libremente de su trabajo mediante una equitativa negociación. En 1948 dos miembros de la Cámara de Representantes de Puerto Rico describían así la situación:

"Sr. Vega Berríos: . . . en mi pueblo, en Yabucoa, vivía el agregado en la tragedia más terrible de su vida. Allí llegó el momento en que se quería abusar de las hijas del agregado, que no podía decir nada."

.    .    .    .    .    .    .    .    .

"Sr. Rivera Colón: . . . Yo, compañero, que vengo de padres agricultores, yo conozco cuál ha sido el trato que se ha dado a los agregados; yo conozco cómo era el trato del patrono, que se imponía no solamente en cuestiones políticas, sino también en cuestiones religiosas y, cuando el patrono era católico, no podía haber un protestante en la finca. Era una gran tragedia; era una cosa tremenda. El empleado no podía votar por el Partido de sus simpatías."—*Actas de la Cámara de Representantes*, 1948 (6ta. a 9na. Legislaturas Extraordinarias), págs. 106–107.

Para remediar tal estado de cosas, se creó el Título V de la Ley de Tierras, mediante el cual se les concede a estos "agregados" una porción de terreno en usufructo gratuito y perpetuo para que en él puedan edificar sus casas libres de toda coacción.

Aunque la ley original en su Art. 78 prohibía que se enajenasen las parcelas sin el consentimiento de la Autoridad de Tierras (organismo público bajo el cual se situó este programa originalmente) tal prohibición no aparecía en el Art. 76 y algunas parcelas fueron a parar a manos de especuladores que se aprovecharon de las necesidades económicas de los agregados, los cuales las enajenaron. Ante tal situación que frustraba los objetivos de la ley, la Asamblea Legislativa enmendó el Art. 76, mediante la Ley Núm. 44 de 9 de junio de 1948, adicionándole a dicho Art. 76 la prohibición específica, bajo pena de nulidad absoluta, de enajenar el usufructo, las parcelas y las mejoras, salvo mediante autorización de la Administración de Programas Sociales. El usar este mecanismo para defender a los económicamente débiles contra los especuladores no era nuevo en Puerto Rico.

Desde que se aprobó la primera Ley de Hogares Seguros en el 1915, Ley Núm. 35 de 11 de marzo de ese año, se dispuso que los terrenos otorgados a las personas que cualificaron bajo la ley, así como las mejoras levantadas sobre los mismos, no podrían ser objeto de embargo, hipoteca u otros gravámenes. También se dispuso que los beneficiarios sólo podrían vender sus derechos *mediante la aprobación de la Comisión de Hogares Seguros.* Art. 17. La Ley de Hogares Seguros de 1921, Ley Núm. 53 de 11 de junio de 1921, adoptó disposiciones iguales en sus Arts. 6(b), 6(k) y 16. Dicho Art. 16 específicamente disponía que los beneficiarios podrían traspasar los solares y las mejoras (1) a personas que cualificasen bajo la ley y (2) mediante la aprobación de la Comisión de Hogares Seguros. En *Gómez* v. *Collazo,* 67 D.P.R. 485, 489 (1947) expresamos: "Es incuestionable que de conformidad

con los términos de la ley creadora de la Comisión de Hogares Seguros cualesquiera traspasos de las casas, solares y granjas por ella cedidos tienen que tener su aprobación." Posteriormente en *Romero* v. *Registrador*, 67 D.P.R. 776, 779 (1947), aludiendo a varias restricciones contenidas en dicha Ley de Hogares Seguros, entre las cuales se incluía la contenida en el citado Art. 16, dijimos:

"Todas esas restricciones y condiciones que hemos enumerado son, a la par que justas y razonables, absolutamente necesarias para evitar que las propiedades cedidas a personas pertenecientes a la clase obrera y de entradas anuales limitadas, pasen a manos de personas mejor acomodadas o de especuladores . . . ."

No cabe duda de que las razones que tuvo la Asamblea Legislativa para la enmienda aclaratoria del 1948, antes mencionada, al Art. 76 fueron de la misma naturaleza a las que aludimos en el arriba citado párrafo de *Romero* v. *Registrador*, supra. Así lo comprueba—si fuese necesario comprobación en vista de la letra expresa del Art. 76—el debate en la Cámara de Representantes cuando se discutía el P. del S. 13 que más tarde se convirtió en la citada enmienda al Art. 76 mediante la Ley Núm. 44 de 9 de junio de 1948. Veamos los siguientes extractos del debate legislativo:

"Sr. Ortiz: . . . Los propósitos de la ley son los de beneficiar a los usufructuarios, no a personas del pueblo, ([10]) y por eso existe esa disposición de que se prohibe vender. Pero hay una disposición que dice que la Autoridad de Tierras puede autorizar a un usufructuario a vender, siempre que sea a una persona que reúna los requisitos que originalmente se exigieron al usufructuario que desea vender . . . la idea es que los que disfruten de estas casas sean usufructuarios y no que estas tierras y propiedades caigan en manos de los 'jaibas' del pueblo. Esa es la idea.

"Sr. Rivera Colón: Quiero hacerle una pregunta al compañero. ¿Hay alguna disposición específica en este proyecto que evite que

---

([10]) Del contexto del debate se puede apreciar que al legislador decir "personas del pueblo" se refería a las personas de las ciudades y zonas urbanas para distinguirlas de los "agregados" que eran campesinos.

vuelve a ocurrir la situación que existe actualmente en esas parcelas, en que la mayor parte de ellas están ocupadas por personas que no son agregados . . .?

"Srta. Gómez: . . . Con estas disposiciones está protegido en todo sentido.

"Sr. Rivera Colón: . . . Lo que pasa es que había en la Ley alguna cosa que no estaba clara, y se estaban negociando y vendiendo las parcelas, y cuando menos se pensaba, se presentaba un señor de San Juan que era un negociante que iba a comprar con la idea de beneficiarse."

V. *Actas de la Cámara de Representantes de Puerto Rico*, 6ta. a 9na. Legislaturas Extraordinarias, 1948, págs. 103–113.

Es claro que en este caso ha ocurrido exactamente lo que la ley se propone evitar. Un comerciante de la ciudad de Río Piedras ha pretendido adquirir por el módico precio de $400.00 un usufructo vitalicio sobre una parcela de mil metros cuadrados que colinda con la playa en el área de Luquillo. Comprendemos lo deseable que es tener una casa de playa en ese sector en donde ya para el año 1963 "en el área de Luquillo, terrenos próximos a la playa, mil metros cuadrados se venden desde cinco a doce mil dólares."[11] Es de conocimiento general que el sector de playa de la costa noreste de Puerto Rico, en donde está ubicada la parcela en cuestión, es de gran valor turístico actual y potencial. Sería un contrasentido y una crasa frustración de la política comprendida en la ley el que un organismo del Gobierno de Puerto Rico comprase o expropiase terrenos para fines públicos y que entonces se pudiese violar la letra clara y expresa de la ley para llevar a cabo lo que en este caso se ha intentado.

---

[11] Negrón-García, *"Impacto del Aumento en el Costo de las Tierras en Puerto Rico: La Administración de Terrenos como Instrumento del Urbanismo,"* 32 Rev. Jur. U.P.R. 451, 461 (1963). En otro trabajo se señala que entre los años 1950 y 1958 el terreno en el municipio de Cataño aumentó de valor 5.12 veces. En Isla Verde, un sector también de la costa noreste, el incremento entre los años 1947–49 fue de 10.7 veces, desde $1.95 el metro a $19.83. V. Torres-Rigual, *"Control of Land Values Through Taxation,"* 23 Rev. Col. Abog. de P.R. 419, 422 (1963).

En otras sociedades industrializadas y más sofisticadas, quizás la protección del Art. 76 no es necesaria; pero en nuestra zona rural, donde se establecen esas comunidades rurales y de la cual provienen los beneficiarios de este programa, dicha protección es necesaria. Este caso así lo comprueba.

No hace mucho, el entonces Gobernador de Puerto Rico Sr. Muñoz Marín, al recomendar legislación para facilitar que las familias que tienen terrenos en usufructo perpetuo bajo el Título V de la Ley de Tierras puedan levantar crédito para mejorar sus hogares, creyó necesario advertir que se hiciese "sin riesgo de que ello ponga a los parceleros en peligro de perder sus tierras a los que las codicien con fines especulativos."—*Mensaje del Gobernador a la Asamblea Legislativa,* 11 de febrero de 1964, pág. 6.

La confiscación aludida, si alguna, es la sanción que tiene la ley para lograr su eficaz cumplimiento. En vista de todas las circunstancias antes consideradas, consideramos que esta sanción no es arbitraria y que tiene relación directa con los propósitos públicos de la Ley de Tierras. Nótese que la sanción opera solamente contra aquellos que violan la ley. Los adquirentes que cualifiquen pueden obtener la aprobación de la Administración de Programas Sociales para la debida adquisición del usufructo y de las mejoras y en ese caso no opera confiscación alguna. Así por ejemplo, la Administración de Programas Sociales no podría confiscar sin compensación los derechos de usufructuario *bona fide* y que no haya transgredido la ley. Tampoco podría confiscar sin compensación los derechos de un adquirente *bona fide,* aceptado por la Administración como tal. Claramente el caso de autos no está comprendido en esas situaciones.

Nos sorprende que ante una letra tan específica como la del Art. 76 se haya ejecutado la escritura antes mencionada. Nos parece que era fácil advertir que su propósito estaba en

408

abierta contravención de la letra y el espíritu de la ley.

Además, son conceptos elementales en nuestro derecho positivo (1) que son nulos los actos ejecutados contra lo dispuesto en la ley, y (2) que los contratantes no pueden establecer pactos, cláusulas y condiciones que sean contrarios a las leyes, Art. 4 del Código Civil, 31 L.P.R.A. sec. 4; Art. 1207 del mismo Código, 31 L.P.R.A. sec. 3372. También es sabido que el que edifica de mala fe en terreno ajeno pierde lo edificado sin derecho a indemnización, Art. 298 del Código Civil, 31 L.P.R.A. sec. 1165. De Castán tomamos la siguiente sentencia: "Quien bastardea la ley, quien desconoce la solidaridad que debe privar en las relaciones jurídicas o quien se conduce con abuso del derecho . . . no merece ampararse en el orden jurídico establecido." [12]

*Se confirmará la sentencia apelada.*

El Juez Presidente Señor Negrón Fernández no intervino. El Juez Asociado Señor Hernández Matos concurre con el resultado.

### APÉNDICE

I. *Libros.*

—Aitken, *Poet in the Fortress: The Story of Luis Muñoz-Marín*, 1964.

—Anderson, *Party Politics in Puerto Rico*, 1965.

—Barela, *The Puerto Rico Labor Relations Act: A State Labor Policy and Its Application*, 1965.

—Benítez, *Sobre el Futuro Cultural y Político de Puerto Rico*, 1965.

—Colorado y Cruz-Monclova, *Noticia y Pulso del Movimiento Político Puertorriqueño*, 1955.

—Comité del Gobernador para el Estudio de los Derechos Civiles en P.R., *Informe al Gobernador de Puerto Rico*, 1959.

---

[12] Castán, *La Propiedad y sus Problemas Actuales*, Editorial Reus, Madrid, (1963), pág. 107.

—Fernós, *Puerto Rico Libre y Federado*, 1951.

—Friedrich, *Puerto Rico: Middle Road to Freedom*, 1959.

—Géigel-Polanco, *El Despertar de un Pueblo*, 1942.

—Goodsell, *Administration of a Revolution*, 1965.

—Hanson, *Transformation: The Story of Modern Puerto Rico*, 1955.

— ″ , *Puerto Rico: Land of Wonders*, 1960.

—Hill y Back, *The Family and Population Control: A Puerto Rican Experiment in Social Change*, 1959.

—Koenig, *A Comprehensive Agricultural Program for Puerto Rico*, 1953.

—Lugo-Silva, *The Tugwell Administration in Puerto Rico*, 1955.

—Mathews, *Puerto Rican Politics and the New Deal*, 1960.

—Mills, Senior y Goldsen, *The Puerto Rican Journey*, 1950.

—Muñoz-Amato, Nélida, *Problemas Administrativos en el Poder Judicial de Puerto Rico*, 1964.

—Muñoz-Amato, Pedro, *Introducción a la Administración Pública*, Vol. I (1954), Vol. II (1957), Fondo de Cultura Económica, México.

—Pacheco-Padró, *Puerto Rico, Nación y Estado*, 1955.

—Pagán, *Historia de los Partidos Políticos Puertorriqueños—1898–1956*, 1959.

—Perloff, *Puerto Rico's Economic Future*, 1950. Hay una versión española titulada *El Futuro Económico de Puerto Rico*, condensado por Reck y traducido por Colorado, 1951.

—Picó, *Diez Años de Planificación en Puerto Rico*, 1952.

—Picó, *Puerto Rico: Planificación y Acción*, 1962.

—Puerto Rico, Government of, *Notes and Comments on the Constitution of the Commonwealth of Puerto Rico*, 1952.

—Puerto Rico, Office of the Commonwealth of, Wash., D.C., *Documents on the Constitutional History of Puerto Rico*, 2da. ed., 1964.

—Ramos de Santiago, *El Gobierno de Puerto Rico*, 1965.

—Rigual, *El Poder Legislativo de Puerto Rico*, 1961.

—Sánchez-Vilella, *Función y Acción de la Rama Ejecutiva*, 1965.

—Senior, *The Puerto Ricans*, 1965.

—Serrano y Rexach, *Un Sistema de Elecciones Primarias para Puerto Rico*, 1955.

—Stead, *Fomento: The Economic Development of Puerto Rico*, A Report of the National Planning Association, 1958.

—Steward et al., *The People of Puerto Rico*, 1956.

—Tugwell, *Puerto Rican Public Papers*, 1945.

—      "      , *The Stricken Land*, 1947.

—      "      , *The Art of Politics*, 1958.

—Tumin y Feldman, *Social Class and Social Change in Puerto Rico*, 1961.

—Universidad de P.R., Escuela de Administración Pública, Informes a la Convención Constituyente, *La Nueva Constitución de Puerto Rico*, 1954.

II. *Documentos Oficiales.* (Citados en orden cronológico.)

—Ley Pública 600, aprobada en 3 de julio de 1950, 64 Stat. 314; L.P.R.A., Vol. 1, ed. 1965, pág. 144.

—Constitución de Puerto Rico, L.P.R.A., Vol. 1, ed. 1965, pág. 217.

—Resolución Núm. 23, Declaraciones Finales de la Convención Constituyente de Puerto Rico, L.P.R.A., Vol. 1, ed. 1965, pág. 151.

—Ley Pública 447, aprobada en 3 de julio de 1952, 66 Stat. 327; L.P.R.A., Vol. 1, ed. 1965, pág. 153.

—Resolución Núm. 34, de la Convención Constituyente de Puerto Rico, L.P.R.A., Vol. 1, ed. 1965, pág. 155.

—Proclama: Fundación del Estado Libre Asociado de Puerto Rico, L.P.R.A., Vol. 1, ed. 1965, pág. 157.

—Carta del Gobernador Luis Muñoz-Marín al Presidente Eisenhower de 17 de enero de 1953, Department of

State Bulletin (Estados Unidos), Vol. 28, Núm. 721, 20 de abril de 1953, pág. 588.

—*Memorandum by the Government of the United States of America Concerning the Cessation of Transmission of Information Under Article 73(e) of the Charter with Regard to the Commonwealth of Puerto Rico*, Department of State Bulletin (E.U.), Vol. 28, No. 721, 20 de abril de 1953, pág. 585.

—Carta del Representante de los Estados Unidos en las Naciones Unidas, Henry Cabot Lodge, al Secretario General de las Naciones Unidas Trygvie Lie, de 21 de marzo de 1953, Department of State Bulletin (E.U.) Vol. 28, No. 721, 20 de abril de 1953, pág. 584.

—Naciones Unidas, *"Resolución 151 Adoptada por la Asamblea General de las Naciones Unidas en su sesión plenaria Núm. 459, 27 de noviembre de 1953."*

—Kennedy, *"Memorandum from the President to the Heads of Executive Departments and Agencies,"* 26 Federal Register 6695 (1961). Este documento también aparece impreso en *Documents on the Constitutional History of P.R.*, 2da. ed., 1964, pág. 206.

—Senado de Estados Unidos, *Informe del Comité de lo Judicial del Senado sobre la Resolución de la Cámara de Representantes 7038, de 14 de agosto de 1961*, 87 Congreso, Primera Sesión, Informe Núm. 735.

—Ley Pública 87–189, aprobada en 30 de agosto de 1961, 75 Stat. 417.

—Resolución Conjunta Núm. 1 de la Asamblea Legislativa de Puerto Rico, de 3 de diciembre de 1962, L.P.R.A., Vol. 1, ed. 1965, pág. 162.

—Ley Pública 88–271, aprobada en 20 de febrero de 1964, L.P.R.A., Vol. 1, ed. 1965, pág. 164.

III. *Artículos, Discursos y Folletos.*

—Amadeo-Murga, *"Distribution of Power Between Federal and Local Courts and the Rise of Federalism in the Commonwealth of P.R.,"* 20 Rev. C. Abo. P.R. 29 (1959).

—Barton, *Puerto Rico's Industrial Development Program,* Harvard University, Center of International Affairs, 29 October 1959.

—Cancio, *"The Power of the Congress to Enter into a Compact with the People of Puerto Rico: The Legal Status of the Compact,"* 22 Rev. C. Abo. P.R. 341 (1962).

—Clapp, *"Management Improvement in Puerto Rico,"* 12 Public Administration Rev. 30 (1952).

—Clark y Rogers, *"The New Judiciary Act of Puerto Rico: A Definite Court Reorganization,"* 61 Yale L.J. 1147 (1952).

—Davis, *"Puerto Rico: A Crowded Island,* 285 The Annals of the American Academy of Political and Social Science (1953), pág. 116.

—Edel, *"Land Reform in Puerto Rico, 1940–1959,"* Caribbean Studies (1952), págs. 26–60.

—Elliot, Shelden, *"Our Faith in Justice: Puerto Rico Shows the Ways to Better Courts,"* 42 A.B.A.J. 24 (1956).

—Emerson, *"Puerto Rico and American Policy Toward Dependent Areas,"* 285 The Annals of the American Academy of Political and Social Science (1953), pág. 9.

—Estados Unidos, Depto. de Estado, *"Puerto Rico's New Self-governing Status,"* 28 Department of State Bulletin, No. 721, April 20, 1953, pág. 584, Washington, D.C.

—Fernós-Isern, *"From Colony to Commonwealth,"* 285 The Annals of the American Academy of Political and Social Science (1953), pág. 16.

—Friedrich, *"The World Significance of the New Constitution,"* op. cit. supra, pág. 42.

—Galbraith y Solo, *"Puerto Rican Lessons in Economic Development,"* op. cit. supra, pág. 55.

—García-Passalacqua, *"La Legalidad de la Estadidad Asociada de Puerto Rico,"* 23 Rev. C. Abo. P.R. 173 (1963). Este trabajo es una versión revisada de uno titulado *"The Legality of the Associated Statehood of Puerto Rico,"* 4 Inter-American Law Review 287 (1962) publicado también en español en esa revista.

—    "    "   , *"The Judicial Process and the Status of Puerto Rico,"* 30 Rev. Jur. U.P.R. 145 (1961).

—Gutiérrez-Franqui y Wells, *"The Commonwealth Constitution,"* 285 The Annals of the American Academy of Political and Social Science (1953), pág. 33.

—Hayn, *"Puerto Rico's Economic Growth,"* 12 Inter-American Economic Affairs 51 (1958).

—Helfeld, *"Congressional Intent and Attitude Toward Public Law 600 and the Constitution of the Commonwealth of Puerto Rico,"* 21 Rev. Jur. U.P.R. 255 (1952). Compárese, del mismo autor su *"Statement Before the Sub-Committee of Insular Affairs of the House and Senate,"* U.S.C., mimeógrafo.

—Hernández-Colón, *"The Commonwealth of Puerto Rico: Territory or State?"* 19 Rev. C. Abo. P.R. 207 (1959).

—Howell, *"The Planning System of Puerto Rico,"* 23 The Town Planning Review 211, University of Liverpool (1952).

—Irizarry, *"Veinte Años de Evolución Presupuestaria en Puerto Rico,"* Boletín de Gerencia Administrativa, Agosto-Sept. 1962, págs. 5–18.

—Life magazine, editorial, *"Thank Heaven for Puerto Rico,"* 15 Marzo 1954.

—Magruder, *"The Commonwealth Status of Puerto Rico,"* 15 U. Pitt. L.R. 1 (1953).

—Morales-Carrión, *Ojeada al Proceso Histórico de Puerto Rico* (1950). Editorial Depto. de Instrucción de P.R., 33 págs.

—Morales-Yordán, *"The Constitutional and International Status of the Commonwealth of Puerto Rico,"* 18 Rev. C. Abo. P.R. 5 (1957).

—Muñoz-Amato, *"Congressional Conservatism and Puerto Rican Democracy in the Commonwealth Relationship,"* 21 Rev. Jur. U.P.R. 321 (1952). También en 285 The Annals of the American Academy of Political and Social Science (1953), pág. 23.

—Muñoz-Marín, *"Puerto Rico in the Area of Democracy,"* 12 The University of Puerto Rico Bulletin 3 (1941).

—   "   "   , *"Development Through Democracy,"* 285 The Annals of the American Academy of Political and Social Science 1 (1953).

—   "   "   , *"Puerto Rico and U.S., Their Future Together,"* 32 Foreign Affairs 541 (1954).

—   "   "   , *Mensajes Anuales del Gobernador a la Asamblea Legislativa de Puerto Rico* (1949–1964). Cada Mensaje impreso por separado, en inglés y español.

—Muñoz-Marín, *"An America to Serve the World,"* (1956), Editorial Depto. de Instrucción.

—Negrón-García, *"Impacto del Aumento en el Costo de las Tierras en Puerto Rico: La Administración de Terrenos como Instrumento del Urbanismo,"* 32 Rev. Jur. U.P.R. 451 (1963).

—Picó, *"The Role of Planning in Puerto Rico,"* 285 The Annals of the American Academy of Political and Social Science 70 (1953).

—Sánchez-Vilella, *"The Challenge of Change,"* Discurso, Ohio State University, 18 marzo 1966. Texto completo en The San Juan Star de 19 marzo 1966, págs. 18 y 42.

—Serrano-Geyls, *"Executive-Legislative Relationships in the Government of Puerto Rico,"* mimeógrafo (1954).

—Steward, *"Culture Patterns of Puerto Rico,"* 285 The Annals of the American Academy of Political and Social Science 95 (1953).

—Torres Rigual, *"Control of Land Value Through Taxation,"* 23 Rev. C. Abo. P.R. 419 (1963).

—Trías, *"Funcionamiento de los Tribunales Bajo la Constitución de Puerto Rico, 1952–1958,"* 28 Rev. Jur. U.P.R. 21 (1958).

— " , *"Derecho y Justicia en Puerto Rico,"* 25 Rev. del C. Abo. de Puerto Rico 417 (1965).

—Warren, *"Address on the Dedication of the New Supreme Court of P.R.,"* mimeógrafo (1956).

—Watson, *"The Contribution of Personnel Management to Puerto Rican Progress,"* 79 Good Government 43 (1962).

—Wells, *"Administrative Reorganization in Puerto Rico,"* 9 Western Political Quarterly 470 (1956).

416

—Wells, *"Constitutional Development in Puerto Rico," Developments Towards Self-Government in the Caribbean*, a symposium, The Netherlands Universities Foundation for International Cooperation, The Hague, pág. 73, (1955).

—   ″   , *"The Nature of Puerto Rican Government and Politics," ibid*, pág. 134.

—   ″   , *"Future Possibilities for Puerto Rican Constitutional Development," ibid*, pág. 201.

—   ″   , *"Ideology and Leadership in Puerto Rican Politics,"* 49 Am. Pol. Sci. Rev. 22 (1955).